UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LELCHOOK, *et al.*,

                        Plaintiffs,

        -against-

SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL,

                     Defendant.

No. 1:19-cv-00033-RJD-SJB

---------------------------------------------------------------

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN S.A.L.**

**ASHCROFT LAW FIRM, LLC**

Michael J. Sullivan
Brian J. Leske
200 State Street, 7th Floor
Boston, MA 02109
T: 617-573-9400
F: 617-933-7607
msullivan@ashcroftlawfirm.com
bleske@ashcroftlawfirm.com

*Counsel for Société Générale de Banque au Liban S.A.L.*

Dated: February 7, 2020

## TABLE OF CONTENTS

*Preliminary Statement* ........................................................................................................1

BACKGROUND .................................................................................................................4

    A.   Plaintiffs ...................................................................................................................4

    B.   SGBL ........................................................................................................................4

    C.   LCB ..........................................................................................................................5

    D.   SGBL Purchases Some, But Not All, Of LCB's Assets And Liabilities............................5

    E.   U.S. Officials Seek Civil Forfeiture Of Certain Of LCB's Assets And Recognize SGBL Has No Successor Liability Based On Its Asset Purchase ........................................6

    F.   LCB Continues To Exist As A Corporation In Lebanon And To Defend ATA-Related Lawsuits ........................................................................................7

    G.   Related Cases and Procedural History .........................................................................8

        1.   *Kaplan v. LCB* – formerly *Licci v. LCB* .........................................................8

        2.   *Lelchook v. LCB* – case overlapping *Kaplan/Licci* .....................................10

        3.   *Lelchook v. SGBL* – the instant case ............................................................11

SUMMARY OF ARGUMENT .........................................................................................13

ARGUMENT ....................................................................................................................14

I.   THIS COURT LACKS PERSONAL JURISDICTION OVER SGBL.............................14

    A.   SGBL Is Not Subject To General Personal Jurisdiction.................................................15

    B.   SGBL Is Not Subject To Specific Personal Jurisdiction ................................................15

        1.   <u>Successor liability allegations do not create and confer personal jurisdiction over a defendant in the first instance</u> ...............................................16

        2.   <u>The exercise of "successor personal jurisdiction" here would not comport with federal due process principles</u> .................................................18

        3.   <u>Under existing law, the FAC allegations are no longer sufficient to show personal jurisdiction over LCB</u> ..............................................................21

II. PLAINTIFFS ARE BARRED FROM PURSUING SUCCESSOR LIABILITY
 CLAIMS AGAINST SGBL ............................................................................22

   A.  Claim Preclusion Bars Plaintiffs' ATA Claims Against SGBL Based Upon Successor
       Liability ...............................................................................................22

   B.  Issue Preclusion Bars Plaintiffs' Attempt To Re-Litigate LCB's Liability ......................26

   C.  Judicial Estoppel Bars Plaintiffs' Successor Liability Position ........................................28

III. THE COMLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE
  GRANTED ...............................................................................................29

   A.  The ATA Does Not Authorize A Successor Liability Action Against An
       Asset Purchaser .....................................................................................29

       1.  The text of the ATA does not explicitly create successor liability .............................29

       2.  The presumption against extraterritoriality bars implication of a
           private right of action against an asset purchased based on successor liability ..........30

       3.  The ATA's text, structure, legislative history, and purpose shows no intent to
           create successor liability ................................................................32

           a.  The ATA's plain language extends only to primary and secondary
               liability ...........................................................................33

           b.  The ATA's structure and liability provisions contradict an intent to
               impose successor liability on an asset purchaser ...............................33

           c.  The ATA's legislative history shows that Congress intended to impose
               liability only on culpable actors ................................................34

           d.  The ATA's purpose, including its intended beneficiaries, does not support
               successor liability against an asset purchaser ...................................35

       4.  No other circumstances justify the creation of a successor liability
           cause of action under a federal common law ...........................................36

   B.  SGBL Is Not Liable For LCB's Alleged Tortious Conduct Committed Prior To
       The Asset Purchase .................................................................................37

       1.  The long-standing rule is that a corporation that acquires the assets of another
           is not liable for the torts of the predecessor .........................................37

2.  None of the exceptions to the non-liability rule for an asset purchaser
       apply here ................................................................................................38

       a.  The assumption of liability exception does not apply because SGBL
            did not expressly or impliedly assume LCB's ATA-related liabilities
            connected to Plaintiffs' injuries ...........................................................38

       b.  The *de facto* merger exception does not apply because there is no common
            ownership of LCB and SGBL after the purchase ............................................39

       c.  The continuation of the predecessor exception does not apply because
            there is no common ownership and LCB continues in existence today ..........39

       d.  The fraudulent conveyance exception does not apply because the asset
            purchase was an arm's length transaction arising from a competitive
            bidding process ................................................................................40

C.  SGBL Has No Successor Liability Because Its Predecessor Has No Liability
     Under The ATA ................................................................................................40

     1.  The Anti-Terrorism Act ................................................................................41

     2.  Plaintiffs fail to allege facts plausibly showing LCB has primary liability
          under the ATA ................................................................................................42

          a.  The FAC fails to allege LCB committed an act of international terrorism ......42

          b.  The FAC fails to allege proximate causation .................................................44

     3.  Plaintiffs fail to allege facts plausibly showing LCB has secondary
          liability under the ATA ....................................................................................46

          a.  The FAC fails to allege the *Halberstam* elements of conspiracy .....................47

          b.  The FAC fails to allege the *Halberstam* elements of aiding-and-abetting .......48

*Conclusion* ................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

*Ahmad v. Christian Friends of Israeli Cmtys.,*
  2014 WL 1796322 (U.S. Dist. Ct., S.D.N.Y. May 5, 2014) .................................................. 46

*Alpert's Newpaper Delivery Inc. v. New York Times Co.,*
  876 F.2d 266 (2d Cir.1989)................................................................................................ 24,27

*Arab Bank, PLC v. Linde,*
  No. 12-1485, 2014 WL 2191224 (U.S. May 23, 2014) .................................................... 31-32

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................................................. 43,44

*Averbach v. Cairo Amman Bank,*
  Case 1:19-cv-004 (U.S. Dist. Ct., S.D.N.Y. Jan. 21, 2020) ...................................................... 3

*Bank v. Hydra Grp., LLC,*
  2017 WL 6806665 (E.D.N.Y. Dec. 1, 2017) ........................................................................... 40

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002) ................................................................................................................... 29

*Bartlett v. SGBL,*
  Case 1:19-cv-00007-CBA-VMS (U.S. Dist. Ct., E.D.N.Y.).................................................... 12

*Bates v. L.I.R.R. Co.,*
  997 F.2d 1028 (2d Cir. 1993)................................................................................................... 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................................................. 39,43

*Boim v. Holy Land Found. For Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008)................................................................................................. 29,33

*BRG Corporation v. Chevron U.S.A., Inc.,*
  163 A.D.3d 1495, 82 N.Y.S.3d 798 (App. Div. 4th Dep't 2018) ......................................... 16,17

*Bristol-Myers Squibb Co. v. Superior Court of California,*
  137 S. Ct. 1773 (2017) .............................................................................................................. 20

*Burger King Corp v. Rudzewicz,*
  *471 U.S. 462* (1985) ............................................................................................................... 19,21

*Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.,*
635 F.3d 48 (2d Cir. 2011) ................................................................. 38

*Cannon v. University of Chicago,*
441 U.S. 677 (1979) ........................................................................... 32

*Cargo Partner AG v. Albatrans, Inc.,*
352 F.3d 41 (2d Cir. 2003) ............................................................ 5,18,39

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, N.A.,
511 U.S. 164 (1994) ........................................................................... 29

*Channer v. Dep't of Homeland Sec.,*
527 F.3d 275 (2d Cir. 2008) ............................................................. 25

*Comm'r of Internal Revenue v. Sunnen,*
333 U.S. 591 (1948) ........................................................................... 22

*Computer Assocs. Int'l v. Altai, Inc.,*
126 F.3d 365 (2d Cir.1997) ............................................................. 25

*Correctional Services Corp. v. Malesko,*
534 U. S. 61 (2001) ........................................................................... 32

*Daimler AG v. Bauman,*
571 U.S. 117 (2014) .................................................................... 15,19,21

*DeRosa v. Nat'l Envelope Corp*
595 F.3d 99, (2d Cir. 2010) ............................................................. 28

*Dritsas v. Amchem Prod., Inc.,*
79 N.Y.S.3d 470 (N.Y. Sup. Ct. 2018), *order reversed by*
94 N.Y.S.3d 264 (1st Dep't 2019) ............................................... 39,40

*Ehrenfeld v. Mahfouz,*
489 F. 3d 542 (2d Cir. 2007) ............................................................. 14

*Erie R. Co. v. Tompkins,*
304 U.S. 64 (1938) ........................................................................... 36

*Ferris v. Cuevas,*
118 F.3d 122 (2d Cir. 1997)) ............................................................. 26

*Fields v. Twitter, Inc.,*
881 F.3d 739 (9th Cir. 2019)............................................................. 45

*Freeman v. HSBC Holdings PLC*,
  2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ................................................. 3,45

*Frydman v. Ackerman*,
  280 F. Supp. 3d 418 (S.D.N.Y. 2017) ............................................................ 27

*Goodyear Dunlop Tires Operations, S. A. v. Brown*,
  564 U.S. 915 (2011) ...................................................................................... 20

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .................................................................. *passim*

*Helicopteros Nacionales de Colombia, S.A. v. Hall*
  466 U.S. 408 (1984) ...................................................................................... 19

*Honickman v. BLOM Bank SAL*,
  Case 1:19-cv-008 (KAM) (U.S. Dist. Ct., E.D.N.Y. Jan. 14, 2020) ............................ 3

*In re Bank of Am. Corp. Sec., Deriv. and ERISA Litig.*,
  757 F. Supp. 2d. 260 (S.D.N.Y. 2010) ............................................................. 7

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 118 (2d Cir. 2013) ........................................................................ 44

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995) ............................................................................. 7

*Jesner v. Arab Bank plc*,
  138 S. Ct. 1386 (2018) ...................................................................... 30,32,34,41

*Kaplan v. Lebanese Canadian Bank SAL*,
  405 F. Supp. 3d. 525 (S.D.N.Y. 2019) ....................................................... *passim*

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) ........................................................................ 43

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ...................................................................................... 30

*Ladjevardian v. Laidlaw–Coggeshall, Inc.*,
  431 F. Supp. 834 (S.D.N.Y. 1977) ................................................................. 39

*Lelchook v. Lebanese Canadian Bank SAL*,
  Case 1:18-cv-12401-GBD (U.S. Dist. Ct., S.D.N.Y. 2010) ........................... 7,10,11,38

*Licci v. Lebanese Canadian Bank SAL*,
  Index No.: 505931/2015, Supreme Court of the State of New York,
  County of Kings: part 66 (Velasquez, J.S.C.) ........................................................ 7,26

*Licci v. Lebanese Canadian Bank, SAL*,
  659 Fed. Appx. 13 (2d Cir. 2016) ........................................................................ 26,27

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ............................................................................ *passim*

*M.O.C.H.A. Soc'y Inc. v. City of Buffalo*
  689 F.3d 263 (2d Cir. 2012) ................................................................................... 27

*Monahan v. N.Y.C. Dep't of Corr.*
  214 F.3d 275 (2d Cir. 2000) ............................................................................... 23,24

*Montana v. United States*,
  440 U.S. 147 (1979) ................................................................................................ 22

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ...................................................................................... 30,31,35

*N. Assur. Co. of Am. v. Square D Co.*,
  201 F.3d 84, 88 (2d Cir. 2000) ............................................................................... 25

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ................................................................................................ 28

*Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO.*,
  451 U.S. 77 (1981) ....................................................................................... 32,33,34

*O'Brien v. City of Syracuse*
  54 N.Y.2d 353 (1981) ............................................................................................. 26

*O'Sullivan v. Deutsche Bank AG*,
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ................................................... *passim*

*Parklane Hosiery Co. v. Shore*
  439 U.S. 322 (1979) ................................................................................................ 27

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  609 F.3d 30 (2d Cir. 2010) ..................................................................................... 14

*RJR Nabisco, Inc. v. European Community*,
  136 S. Ct. 2090 (2016) ................................................................................... 30,31,35

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)................................................................. 29,30,41,44,46

*Ruiz v. Commissioner of Dept. of Transportation of the City of New York*,
  858 F.2d 898 (2d Cir. 1988)................................................................. 24

*Rush v. Savchuk*,
  444 U.S. 320, 332 (1980) ................................................................. 19

*Russell v. SunAmerica Securities*,
  962 F.2d 1169 (5th Cir. 1992)................................................................. 24

*Schumacher v. Richards Shear Co.*,
  59 N.Y.2d 239, 451 N.E.2d 195, 464 N.Y.S.2d 437 (1983) ................................ 18,38

*Semenetz v. Sherling & Walden, Inc.*,
  851 N.E.2d 1170, 7 N.Y.3d 194 (2006) .............................................. *passim*

*Senatore v. Ocwen Loan Servicing, LLC.*,
  2017 WL 3836056 (S.D.N.Y Aug. 21, 2017) ................................................ 24

*Siegel v. Apergis*,
  610 Fed. App'x 15 (2d Cir. 2015)................................................................. 22

*Siegel v. HSBC N.A. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)................................................................. 50

*Simon v. Safelite Glass Corp.*,
  128 F.3d 68 (2d Cir. 1997)................................................................. 22,28

*Sinochem International Co. v. Malaysia International Shipping Corp.*,
  549 U.S. 422 (2007) ................................................................. 22

*Small v. U.S.*,
  544 U.S. 385 (2005) ................................................................. 31

*SPV Osus, Ltd. v. UBS AG*,
  882 F.3d 333 (2d Cir. 2018)................................................................. 14,19,21

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ................................................................. 32

*TBA Glob., LLC v. Fidus Partners, LLC*,
  132 A.D.3d 195, 15 N.Y.S.3d 769 (App. Div. 1st Dep't 2015)................................ 18

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ................................................................. *passim*

*United States Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n,*
    916 F.3d 143 (2d Cir. 2019) ............................................................. *passim*

*U.S. v. Bestfoods*,
    524 U.S. 51 (1998) ................................................................................. 37

*U.S. v. Lebanese Canadian Bank SAL*,
    Case 1:11-cv-09186-PAE (U.S. Dist. Ct., S.D.N.Y.) ........................... 6

*U.S. v. Mendoza,*
    464 U.S. 154 (1984) .............................................................................. 26

*Vasquez v. Ranieri Cheese Corp.*,
    2010 WL 1223606 (E.D.N.Y. Mar. 26, 2010) ............................... 18,39

*Walden v. Fiore*,
    571 U.S. 277 (2014) ..................................................................... *passim*

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ........................... 14,15,18,19,20,25

*Waldman v. Villiage of Kiryas Joel*,
    126 F.3d 365 (2d Cir. 1997) ................................................................. 25

*Weiss v. Nat'l Westminster Bank PLC*,
    381 F. Supp. 3d 223 (E.D.N.Y. 2019) ................................................ 25

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U. S. 286 (1980) ............................................................................ 20

*Wyly v. Weiss*,
    697 F.3d 131 (2d Cir. 2012)) .............................................................. 26

*Zapata v. HSBC Holdings PLC*,
    2019 WL 4918626 (E.D.N.Y. Sept. 30, 2019) ...................................... 3

**Statutes**

18 U.S.C. § 2331(1) ................................................................ 31,41,42,46

18 U.S.C. § 2333 ..................................................................................... 35

18 U.S.C. § 2333(a) ......................................................... 4,23,29,31,33,41

18 U.S.C. § 2333(d) ...................................................... 29,31,33,42,46,47

18 U.S.C. § 2336(a) ............................................................................................................. 42

Fed. R. Evid. 201 .................................................................................................................. 7

**Other Authorities**

138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992) ............................................................... 36

Hearing on S. 2465 Before the S. Comm. on the Judiciary, 101st Cong. 46-47 (1990)................ 36

S. REP. 102-342, S. Rep. No. 342, 102ND Cong., 2ND Sess. 1992,34
  1992 WL 187372 (Leg. Hist.) ......................................................................................... 34

**Treatises**

Prosser on Torts, §2 ............................................................................................................ 33

### *Preliminary Statement*

Defendant Société Générale de Banque au Liban S.A.L. ("SGBL") abhors terrorism in all its forms and Plaintiffs' attempt to pursue SGBL in this litigation as a *de facto* international terrorist and an entity responsible for the alleged prior bad acts of another bank is implausible, offensive, and lacks all merit as a matter of both law and fact. The operative complaint allegations regarding SGBL – in addition to being unsupported and utterly conclusory – are belied by common-sense and publicly-available information known to the Plaintiffs and their lawyers for many, many years.

As an initial matter, Plaintiffs do not allege SGBL played any role in the tortious conduct alleged in the FAC – specifically, the provision of banking services to five customers allegedly linked to Hezbollah – or had anything to do with the rocket attacks in Israel that caused Plaintiffs' injuries. Instead, Plaintiffs' entire lawsuit is based on SGBL's alleged successor status by virtue of its purchase of certain assets and liabilities of the Lebanese Canadian Bank ("LCB") almost ten years ago. What Plaintiffs' complaint does not say is that SGBL's arms-length, all-cash purchase of some, but not all, of the assets and liabilities of LCB had the support of not only the Central Bank of Lebanon ("Central Bank"), but also the U.S. Departments of Treasury and Justice. The integrity of the asset purchase process – where SGBL worked for many months with independent, international compliance experts and respected auditing firms to screen LCB's accounts, customers, loan portfolios and operations to help ensure SGBL would avoid taking on customers who might be associated with money laundering – was widely reported and recognized at the time. In fact, U.S. government officials characterized SGBL as a "responsible owner" and concluded that it would not assume successor liability arising from its lawful purchase of certain LCB assets and liabilities. *See infra* at 5-6.

Notwithstanding these circumstances, the passage of time, and an ongoing ten-year legal battle against LCB, Plaintiffs now, for the first time, seek to hold SGBL liable for LCB's earlier

- 1 -

alleged conduct under the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA").   In the ATA, Congress sought to hold terrorists accountable for their actions by providing a federal cause of action – a "primary liability" ATA claim – that requires proof that the defendant engaged in "international terrorism" and that the defendant's acts caused the plaintiff's injuries.  In JASTA, Congress amended the ATA to create an aiding-and-abetting and conspiracy cause of action – a "secondary liability" ATA claim – in certain narrow circumstances.

This Court need not reach the merits of the ATA claims, however, because the FAC is fatally flawed for several threshold reasons.

First, Plaintiffs concede, as they must, that SGBL itself does not have any contacts with New York or the United States to support this Court's exercise of personal jurisdiction.  To try to remedy this glaring jurisdictional defect, Plaintiffs seek to impute LCB jurisdictional contacts in New York on SGBL based on the asset and liability purchase in Lebanon.  But New York appellate courts have squarely rejected such imputation attempts, observing that successor rules are concepts of tort liability, not jurisdiction.  Nor would such an exercise comport with constitutional due process principles that rely upon the *defendant's* contacts with the forum.  As such, Plaintiffs fail to state a *prima facie* case of personal jurisdiction over SGBL.

Next, even assuming the exercise of personal jurisdiction were proper, Plaintiffs have already sued SGBL's alleged predecessor, LCB, under the ATA for its role in the same rocket attacks in Israel in 2006 – and lost.  *See Kaplan v. Lebanese Canadian Bank SAL,* 405 F. Supp. 3d. 525 (S.D.N.Y 2019) (granting LCB's motion to dismiss), *appeal filed sub nom*, *Licci v. American Express Bank Ltd.*, No. 19-3522 (2d Cir.).  That case determined that LCB had no ATA liability for its alleged conduct and the appeal of that decision does nothing to prevent the

application of preclusion principles to bar Plaintiffs from pursuing SGBL here and now for the same determined and dismissed liability.

Even so, Plaintiffs cannot point to any basis in the ATA to permit the adjudication of foreign successor liability questions through a private right of action against an asset purchaser, let alone the imposition of federal successor liability on that basis. By its own terms, the ATA extends its jurisdiction and liability provisions to terrorist-related acts committed abroad over those who commit them. Nor have Plaintiffs alleged any non-conclusory facts to show that SGBL is LCB's alleged successor for the alleged tortious conduct caused by LCB's employees.

Even if Plaintiffs could overcome these threshold deficiencies, Plaintiffs face another insurmountable hurdle: SGBL is only liable to the same extent as its predecessor, and Plaintiffs' theory of ATA liability has been resoundingly rejected by courts in this Circuit. The last year alone has seen the dismissal of ATA claims against banks in *Kaplan*, 405 F. Supp. 3d. at 525, *Freeman v. HSBC Holdings PLC*, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019), *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019), and *Zapata v. HSBC Holdings PLC*, 2019 WL 4918626 (E.D.N.Y. Sept. 30, 2019). Last month, *Honickman v. BLOM Bank SAL*, Case 1:19-cv-008 (KAM) (U.S. Dist. Ct., E.D.N.Y. Jan. 14, 2020), was dismissed, and yet another, *Averbach v. Cairo Amman Bank*, Case 1:19-cv-004 (U.S. Dist. Ct., S.D.N.Y.) (Jan. 21, 2020), has been recommended for dismissal. The common thread in these cases is courts' refusal to allow allegations of arms-length banking services to replace what the law requires: allegations supporting a plausible inference that the bank defendants committed, or knowingly provided substantial assistance to, or conspired with perpetrators of, acts of international terrorism.

In sum, Plaintiffs' claims against SGBL have no support under the ATA and their attempt to hold a foreign bank and good-faith asset purchaser like SGBL liable for LCB's conduct should

be rejected on jurisdictional grounds, on preclusion grounds, and for failing to demonstrate the existence of any ATA-related liability arising from LCB's conduct.

## BACKGROUND[1]

### A. Plaintiffs

Plaintiffs are U.S. nationals who claim they were injured by rocket attacks carried out by Hezbollah between July 12, 2006, and August 14, 2006 against northern Israel during a 34-day conflict known as the Second Lebanon War. Dkt. 73 (First Amended Complaint ("FAC")) ¶59 (Filed 12/09/19).[2] Hezbollah "is, and at all relevant times was, a complex, composite organization, … composed of various subordinate entities[.]" *Id*. ¶30. Plaintiffs do not name, and presumably do not know, the identity of any individual responsible for firing a rocket that caused their injuries. Nor do Plaintiffs allege that LCB or any of its employees participated in firing such a rocket.

Four of the Plaintiffs (the "Lelchooks," *see* FAC ¶8, n.1), are the estate and family members of David Martin Lelchook who was killed in the rocket attacks. FAC ¶¶2, 61-66. The remaining Plaintiffs allege they suffered psychological, physical, and/or emotional injuries as a result of the attacks or their proximity to the rocket attacks. FAC ¶¶67-80.

### B. SGBL

SGBL is a Lebanese joint stock company incorporated in 1953 and headquartered in Lebanon. FAC ¶¶10, 11. It offers a wide array of banking, insurance, and financial services to individuals and corporations in Lebanon and the region. Plaintiffs do not allege that SGBL had anything to do with LCB's decisions regarding, or provision of, banking services to any particular LCB customer at any time.

---

[1] SGBL accepts as true all complaint allegations that are well-pleaded, non-conclusory, and not contradicted by other complaint allegations or facts of which this Court may take judicial notice. SGBL's motion relies upon the complaints, any materials incorporated by reference, and documents subject to judicial notice.
[2] The FAC concedes that Ester Lelchook is not a U.S. national. FAC ¶66, n. 10. Because the ATA extends its private right of action only to "any national of the United States," SGBL reserves the right to seek dismissal on that ground should it become necessary. 18 U.S.C. §2333(a).

## C.  LCB

LCB is a corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.  FAC ¶3.  In 2011, the U.S. Department of the Treasury designated LCB as "a financial institution of primary money laundering concern."  *Id*. ¶117.  Following (contested) allegations lodged against it by the U.S. Government – none of which pertain to the events of the Second Lebanon War – LCB made a commercial decision to sell its assets in 2011.

### D.  SGBL Purchases Some, But Not All, Of LCB's Assets And Liabilities

After LCB's designation, the Central Bank proceeded with a competitive sale of LCB's assets and certain liabilities pursuant to Lebanese law.  SGBL was deemed the highest bidder and agreed in a Lebanese sale and purchase agreement ("SPA") to purchase some, but not all, of LCB's assets and liabilities for $500+ million cash subject to the final valuation adjustments, review and approval of the Central Bank.  *Id*. ¶121; Dkt. 1 (Complaint ("Compl.")), ¶638.[3]

The FAC alleges that SGBL assumed all of LCB's liabilities.  FAC ¶126.  SGBL recognizes that it is not entitled to offer specific, affirmative evidence at this stage of the proceeding to show that it did not contractually assume LCB's ATA liability arising from the Hezbollah rocket attacks.  Even so, Plaintiffs' conclusory allegation is implausible and contracted not only by Plaintiffs' own earlier pleadings but by documented facts of which this Court may take judicial notice.  For instance, those documents show SGBL declined to assume certain LCB customers and accounts based in large measure upon a compliance process undertaken by independent international compliance experts and a parallel auditing proceeding implemented by

---

[3] Asset sales differ in nature from mergers and stock acquisitions.  An asset sale is neither the acquisition of a business entity, nor a merger of the seller and buyer.  Instead, it is a transfer of property, tangible or intangible.  That is, "the nature of an asset sale is that the seller's ownership interest in the entity is given up in exchange for consideration." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 47 (2d Cir. 2003).  SGBL's no-stock, all-cash transaction therefore cannot be characterized as a corporate reorganization, continuation of a business, or a merger (statutory or otherwise).

SGBL that utilized a scoring methodology to screen LCB's accounts, customers, and operations. Compl. ¶638 (pursuant to SPA, "SGBL agreed to acquire *substantially all* of LCB's assets and liabilities") (emphasis added); *see infra*, at 6-7 (discussing asset forfeiture settlement referenced by Plaintiffs, Compl. ¶56). Based on SGBL's due diligence and commitment to combat money laundering and the financing of terrorist organizations, the U.S. Government supported the purchase and considered SGBL a "responsible owner."[4]

Plaintiffs' further characterization that SGBL "stripped [LCB] of its assets," FAC ¶128, is false, too, and inconsistent with complaint allegations. As noted, the transaction between SGBL and LCB was not a merger or stock swap. Instead, it was an asset purchase in which LCB shareholders received approximately $500+ MM cash from SGBL, thereby belying Plaintiffs' claim that "but for SGBL's purchase of LCB's assets and assumption of its liabilities, LCB would easily have been able to satisfy a judgment against it in favor of the plaintiffs." FAC ¶130.

### E. U.S. Officials Seek Civil Forfeiture Of Certain Of LCB's Assets And Recognize SGBL Has No Successor Liability Based On Its Asset Purchase

While the asset purchase was pending, the Justice Department sought a civil forfeiture of $150 million in what the Government believed to be LCB assets that were being held in escrow by a third-party financial institution in connection with the asset purchase by SGBL. *U.S. v. Lebanese Canadian Bank SAL*, Case 1:11-cv-09186-PAE (U.S. Dist. Ct., S.D.N.Y.). SGBL filed a claim as an innocent, lawful owner of a portion of the escrow funds in March 2013. *See* Declaration of Michael J. Sullivan, dated February 7, 2020 ("Sullivan Decl."), Ex. A (Sworn Claim Asserting Interest in Seized Property) ("Claim"), ¶13. The Government, LCB, and SGBL reached an agreement as to the disposition of LCB's seized funds in June 2013. Sullivan Decl., Ex. B

---

[4] *See* Jo Becker, *Beirut Bank Seen as a Hub of Hezbollah's Financing* (*The New York Times*, Dec. 13, 2011) available at https://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html.

(Stipulation and Order of Settlement ("Stipulation" or "Stip.")).   Tellingly, the Government

explicitly stated that SGBL would assume no successor liability:

> 10. The United States shall not bring any claim against SGBL, its directors, officers,
> shareholders, agents, employees, or affiliates arising out of the lawful acquisition
> of LCB's assets and liabilities pursuant to the Sale and Purchase Agreement, for
> the Alleged Scheme and/or under a theory of successor liability.

Stip., ¶10.   The Stipulation also makes clear that SGBL faced no liability in the action, and that

LCB, for its part, made no admission of any wrongdoing.   Stip., ¶¶2, 4.[5]

Despite (a) the well-publicized nature of the asset purchase transaction,  (b) the public civil

forfeiture proceeding (and being on notice of both),[6] and (c) Plaintiffs' counsel's pending claims

against LCB, Plaintiffs made no attempt to attach LCB's seized funds in the United States or funds

being held by the Central Bank in Lebanon, or, for that matter, sue SGBL based on its purported

status as LCB's successor.

### F.   LCB Continues To Exist As A Corporation In Lebanon And To Defend ATA-Related Lawsuits

Although its U.S. Treasury designation effectively put LCB in a position where it had to

cease banking operations, LCB remains a viable corporation in Lebanon.   Furthermore, LCB

continues to defend ATA-related lawsuits in federal and state courts in New York, including cases

involving the rocket attacks at issue here.   *See, e.g.*, *Kaplan,* 405 F. Supp. 3d. at 525 (granting

LCB's motion to dismiss); *Lelchook v. Lebanese Canadian Bank SAL*, Case 1:18-cv-12401-GBD

(U.S. Dist. Ct., S.D.N.Y. 2010) (currently stayed); *Licci v. Lebanese Canadian Bank SAL*, Index

---

[5] The Stipulation and FAC allegations thus also contradict Plaintiffs' conclusory allegation that "SGBL bought out LCB lock, stock and barrel." FAC ¶124.  When ruling on a motion to dismiss, this Court may consider documents relied upon by Plaintiffs and publicly available filings.  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam); Fed. R. Evid. 201.

[6] *See* Jo Becker, *U.S. Sues Businesses It Says Helped Hezbollah* (The New York Times, Dec. 16, 2011) available at https://www.nytimes.com/2011/12/16/world/middleeast/us-sues-american-and-lebanese-businesses-it-says-helped-hezbollah-money-laundering.html. This is a related piece to the article referenced above (*see* n. 4).  "On a motion to dismiss, a court may take judicial notice of the publication of a newspaper article."  *In re Bank of Am. Corp. Sec., Deriv. and ERISA Litig.*, 757 F. Supp. 2d. 260, 302 (S.D.N.Y. 2010).

No.: 505931/2015, Supreme Court of the State of New York, County of Kings: part 66 (Velasquez, J.S.C.) (LCB's motion to dismiss pending).  This fact – of which this Court may take judicial notice – wholly undermines the premise of Plaintiffs' successor liability theory and the allegation that SGBL's assumption of LCB's liabilities were "sweeping and all inclusive."  FAC ¶126.

### G.  Related Cases And Procedural History

Several lawsuits that Plaintiffs and their counsel have filed against LCB provide additional context in which this case arises (including for purposes of applying preclusion principles).  These cases show that the instant case mirrors several that Plaintiffs either have pursued, or are pursuing, against LCB based upon the same Hezbollah rocket attacks.

### 1.  *Kaplan v. LCB* – formerly *Licci v. LCB*

In 2009, Plaintiffs' counsel first asserted claims against LCB under the ATA for injuries sustained from 2006 Hezbollah rocket attacks in Israel based upon LCB's provision of banking services to five alleged Hezbollah-related customers.  *Licci v. American Express Bank Ltd.*, Case 1:08-cv-07253-GBD (U.S. Dist. Ct., S.D.N.Y.), Dkt. 23 (Filed 1/22/09) ("*Licci*").  These claims now have been dismissed three times – first on personal jurisdiction grounds, next on collateral estoppel grounds, and, having been revived last year, on the merits.  405 F. Supp. 3d. at 530-31 (discussing procedural history and proceeding to decide merits).

When the *Licci* ATA claims were revived, Plaintiffs' counsel filed a second amended complaint and the case became *Kaplan v. LCB*.  Case 1:08-cv-07253-GBD, Dkt. 99 ("*Kaplan* SAC").  A comparison of the *Kaplan* SAC and the operative complaint in the instant case before this Court ("*Lelchook v. SGBL* FAC") reveals that all 18 of the plaintiffs in *Kaplan* are plaintiffs here with the only difference being that this case includes the four members of the Lelchook family

(two of which are suing in multiple capacities) and three American nationals who resided in Israel during the Second Lebanon War.

The substantive factual allegations supporting LCB's purported liability under the ATA for its alleged role in the rocket attacks are indistinguishable, if not identical.  *Compare Kaplan* SAC ¶¶5-24 ("Hizbollah"), 25-48 ("Defendant's Provision of Wire Transfer and Other Banking Services to Hizbollah"), 62-71 ("Plaintiffs' Injuries Are the Result of Defendant's Conduct"), 72-87 ("Defendant LCB Knew or Should Have Known That Its Conduct Would Result in Harm to the Plaintiffs"), 88-98 ("Defendant Intended That Its Conduct Would Result in Harm to the Plaintiffs"), 99-107 (First Claim for Relief), 108-116 (Second Claim for Relief) *with Lelchook v. SGBL*, FAC ¶¶17-34,[7] 35-58, 81-90, 91-106, 107-117, 131-139, 144-152; *see also Kaplan* SAC ¶49 ("Between July 12, 2006 and August 14, 2006, Hizbollah fired thousands of rockets at civilians in northern Israel" *with Lelchook* FAC ¶59 ("The Hizbollah Rocket Attacks were carried out between July 12, 2006 and August 14, 2006, when Hizbollah fired thousands of rockets and missiles at civilians in northern Israel.").  The *Kaplan* SAC does not mention SGBL, let alone name it as a defendant.

Last year, LCB moved to dismiss the *Kaplan* SAC.  *See Kaplan*, 1:08-cv-07253-GBD (S.D.N.Y.), Dkt. 106 (LCB's Memorandum of Law in Support of Motion to Dismiss); Dkt. 109 (Plaintiffs' Motion in Opposition); Dkt. 112 (LCB's Reply).  On September 20, 2019, U.S. District Court Judge George B. Daniels granted the motion, finding LCB had no primary or secondary liability for injuries from the rocket attacks based upon the alleged provision of banking services to the five customers as alleged in the SAC.  405 F. Supp. 3d at 531-37.

---

[7] Paragraphs 6 and 7 are missing from the *Kaplan* SAC, which accounts for the different number of paragraphs in the *Lelchook* FAC.

In dismissing the primary liability claim against LCB, Judge Daniels concluded, among other things, that LCB's provision of financial services does not equate to international terrorism, and that, even if it did, "[t]he causal link between [LCB's] provision of financial services and Plaintiffs' injuries is too attenuated to support a finding of proximate cause." 405 F. Supp. 3d. at 533. In dismissing the secondary liability claims, Judge Daniels concluded: "Plaintiffs fail to plausibly allege that [LCB], when processing wire transfers, conspired with or aided and abetted Hizbollah in perpetrating the rocket attacks." *Id.* at 534. The Court concluded that by providing financial services to its customers, LCB cannot be said to have been "aware" it was playing a "role" in terrorist activity, let alone be said to have "substantially assist[ed] the principal violation." *Id.*; *see also Linde v. Arab Bank*, 882 F.3d 314, 328-31 (2d Cir. 2018); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The Court also found that there were no *non-conclusory* allegations in support of any conspiracy liability that "would lead one to infer that [LCB] shared any common goal of committing an act of international terrorism." 405 F. Supp. 3d. at 534.

Finally, Judge Daniels observed that while "the U.S. Treasury's analysis and the [Justice Department's] complaint in the forfeiture action include damning allegations that [LCB] was involved in a money laundering scheme with links to Hizbollah," the processing of funds through LCB accounts does not plausibly allege that LCB "knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks," or that "Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds." *Id.* at 536 (emphasis supplied).

As noted, the *Kaplan* Plaintiffs have appealed, and appellate briefing is underway.

## 2.   *Lelchook v. LCB* – case overlapping *Kaplan/Licci*

On December 31, 2019, on the eve of the expiration of the statute of limitations, Plaintiffs'

counsel filed another ATA complaint substantially mirroring his *Kaplan* SAC.   *See Lelchook v.*

*Lebanese Canadian Bank SAL*, Case 1:18-cv-12401 (S.D.N.Y.), Dkt. 1 (Filed 12/31/18)

("*Lelchook v. LCB* Complaint").   The filing was accompanied by a "Related Case Statement"

making clear that the newly-filed case overlapped with *Kaplan*:

> Both cases are civil actions for international terrorism under the Antiterrorism Act,
> 18 U.S.C. sec. 2333, brought against the Lebanese Canadian Bank, SAL ("LCB")
> by U.S. citizens injured or killed by rockets fired by Hezbollah into Israel in 2006.
>
> The later-filed case adds several new plaintiffs who were not parties to the earlier-
> filed case.   Additionally, the later-filed case names as defendants senior officers of
> LCB who were involved in LCB's provision of banking service to Hezbollah, and
> all the plaintiffs in the earlier-filed case are also plaintiffs in the later-filed case, in
> respect to the claims against the new defendants.
>
> In sum, the two cases overwhelmingly overlap in all material ways.

*See* Sullivan Decl., Ex. C (*Lelchook v. LCB*, Dkt. 11 (Filed 1/02/19)).

A comparison of the *Lelchook v. LCB* Complaint with the FAC here shows that the named

plaintiffs and underlying substantive allegations are indistinguishable.   This means, *a fortiori*, that

the instant case, too, "overlap[s] in all material ways" with *Kaplan*.   As with *Kaplan*, the *Lelchook*

*v. LCB* Complaint does not mention SGBL.

Although LCB intends to argue in an anticipated motion to dismiss that, among other

things, *Kaplan* has preclusive effect, the parties agreed in the "interest of judicial efficiency" to a

stay the case pending the appeal of *Kaplan*.   *Lelchook v. LCB*, Dkt. 35 (Filed 10/09/19).

## 3.   *Lelchook v. SGBL* – the instant case

At approximately the same time *Lelchook v. LCB* commenced, Plaintiffs' counsel filed the

original complaint in the instant case, *Lelchook v. SGBL*, Case 1:19-cv-00033 (U.S. Dist. Ct.,

E.D.N.Y), Dkt. 1 (Filed 1/02/19).   This complaint, however, did not mirror *Kaplan* or *Lelchook v.*

*LCB*.  Instead, Plaintiffs' counsel mirrored a complaint filed by another counsel in another ATA matter, *Bartlett v. SGBL*, Case 1:19-cv-00007-CBA-VMS (U.S. Dist. Ct., E.D.N.Y.), Dkt. 1 (Filed 1/1/19) ("*Bartlett* Complaint").  The 500+ page *Bartlett* Complaint named eleven financial institutions in Lebanon as defendants, together accounting for approximately 80% of the total assets in the Lebanese banking sector.  The *Bartlett* Plaintiffs alleged that these banks held accounts for certain commercial entities and individuals that have or had a connection to Hezbollah, and therefore the banks somehow bear responsibility for injuries to certain U.S. military personnel serving in Iraq during the Iraq War.  The *Bartlett* complaint did not name LCB as a defendant but asserted a successor liability claim against SGBL.  The *Bartlett* Defendants (including SGBL) filed pre-motion conference letters and moved to dismiss the complaint on jurisdictional grounds and for failure to state a claim.

As this Court is aware, the Lebanese Bank Defendants in this case did the same thing as the *Bartlett* Defendants and filed pre-motion conference letters seeking this Court's permission to file motions to dismiss.  Counsel in the *Bartlett* matter, however, filed an amended complaint in response to the respective motions to dismiss that had been filed.  After a pre-motion conference with this Court in this case, Plaintiffs' counsel thereafter made the decision to abandon the *Bartlett* complaint allegations and instead to file the operative, amended complaint here **solely against SGBL** mirroring the *Kaplan* and *Lelchook v. LCB* complaints based solely on successor liability.

The crux of Plaintiffs' underlying theory of ATA liability on the part of SGBL's alleged predecessor is that "banking services" provided by LCB enable Hezbollah "to plan, to prepare for and to carry out terrorist attacks … including rocket attacks on civilians generally and the [rocket attacks at issue] specifically." FAC ¶¶82-83.  Plaintiffs further allege that financial services

provided by LCB "substantially increased and facilitated" Hezbollah's "ability to plan, to prepare for and to carry out attacks on civilians, including the [rocket attacks at issue]." *Id*. ¶84.

More specifically, the FAC alleges that that LCB provided financial services to two alleged Hezbollah "leaders" (Husayn al-Shami and Wahid Mahmoud Sbeity (*id*. ¶48)); a charity allegedly "controlled by" Hezbollah (Shahid Foundation (*id*. ¶¶31-32); and two companies that were allegedly "controlled by," and provided financial and investment services to, Hezbollah (Bayt al Mal and Yousser Company for Finance and Investment ("Yousser Company") (*id*. ¶33)) (collectively, "the Five Customers"). Importantly, none of the Five Customers were designated by the United States as having an affiliation with Hezbollah (or with any other Foreign Terrorist Organization ("FTO")) prior to the end of the Second Lebanon War. And Plaintiffs do not provide any facts to show or support a reasonable inference that the Five Customers used LCB's financial services to perpetrate a rocket attack that caused their injuries.

The briefing of this motion to dismiss followed. Dkt. 77 (Entered 12/26/2019).

## SUMMARY OF ARGUMENT

The FAC against SGBL should be dismissed for five independent reasons.

*First*, Plaintiffs fail to allege facts showing SGBL is subject to personal jurisdiction to permit adjudication of its purported successor liability. The FAC does not allege any conduct by SGBL in New York or otherwise that has any connection to that determination. Nor does the FAC allege any conduct by SGBL that is connected to Plaintiffs' claims or injuries. Indeed, Plaintiffs' imputed personal jurisdiction theory based on purported successorship has been squarely rejected in New York and does not comport with federal due process principles.

*Second*, Plaintiffs are barred from pursuing a successor liability claim against SGBL because the underlying primary and secondary liability claims against its alleged predecessor,

LCB, and issues related to that determination, already have been litigated by Plaintiffs and their counsel in *Kaplan v. LCB*. Nor does the appeal of that adverse determination prevent the application of claim preclusion, issue preclusion and judicial estoppel here.

*Third*, although the ATA authorizes a cause of action based on primary and secondary liability, Congress did not explicitly authorize a private right of action directly against a foreign asset purchaser based on *successor* liability. Plaintiffs can point to no basis in the ATA permitting such an action, remedy, or imposition of such a federal liability on SGBL, a foreign entity.

*Fourth*, even assuming the ATA authorizes a private right of action or remedy based on successor liability, the long-standing rule is that an asset purchaser like SGBL generally is *not* liable for the tort liabilities of its predecessor arising prior to the transfer. Here, the FAC fails to allege facts plausibly showing SGBL assumed LCB's ATA-related liabilities.

*Fifth*, SGBL may only be held liable to the same extent as its alleged predecessor. The decision in *Kaplan* and many other recent ATA opinions in this Circuit show that LCB's conduct does not satisfy the proximate causation standard or the definitional requirements to state a primary liability claim under the ATA, nor does it meet fundamental requirements to state a secondary liability (conspiracy or aiding and abetting) claim under JASTA.

## ARGUMENT

## I.    THIS COURT LACKS PERSONAL JURISDICTION OVER SGBL

The FAC must be dismissed because it fails to show that this Court has personal jurisdiction over SGBL. Plaintiffs' sole basis for jurisdiction – "successor personal jurisdiction" – has been flatly rejected in New York and violates fundamental due process principles. FAC ¶16.

"[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (emphasis added). Plaintiffs "must include an averment of facts that, if

credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018).   The exercise of personal jurisdiction must comport with principles of constitutional due process.  *See Waldman v. PLO*, 835 F.3d 317, 343 (2d Cir. 2016); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007).  This means SGBL must have "sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction," and the exercise of personal jurisdiction must "comport[] with 'traditional notion of fair play and substantial justice' under the circumstances." *Waldman*, 835 F.3d at 331 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014)).

Because Plaintiffs fail to show that SGBL is subject to either general or specific personal jurisdiction in this action, the action must be dismissed.

## A.  SGBL Is Not Subject to General Personal Jurisdiction

Plaintiffs do not allege that SGBL (or LCB for that matter) is incorporated or maintains its principal place of business in New York or elsewhere in the United States or has other "exceptional" affiliations with the United States that are so continuous and systematic as to render the corporation "at home" here.  *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014); FAC ¶3 (LCB incorporated and headquartered in Lebanon); *id*. ¶10, 11 (SGBL incorporated and headquartered in Lebanon).  Therefore, as an initial matter, there is no all-purpose or "general jurisdiction" that would permit a court to hear all claims against SGBL, including those unrelated to the forum state.  In the absence of general jurisdiction, Plaintiffs must show specific (suit-related) jurisdiction.

## B.  SGBL Is Not Subject to Specific Personal Jurisdiction

Plaintiffs' underlying theory of successor liability is based upon a Lebanese SPA between LCB and SGBL.  FAC ¶12.  But Plaintiffs do not allege – because they cannot – that the SPA has any connection or relationship to New York or the United States, or that SGBL took any act in the

- 15 -

forum related to Plaintiffs' claims and injuries.  Under these circumstances, due process principles preclude this Court from exercing personal jurisdiction to adjudicate the successor liability claims, let alone impose federal liability on SGBL on that basis.  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (to exercise jurisdiction, "the *defendant's* suit-related conduct must create a substantial connection with the forum State") (emphasis added).

Plaintiffs only argument is that the Second Circuit's decision in *Licci* "determined that LCB's conduct described herein rendered it to personal jurisdiction in the State of New York, and SGBL assumed and bears successor liability for LCB's conduct described herein and so is also subject to personal jurisdiction in New York." FAC ¶16.  The problem with this theory is that (1) successor principles are a means to establish tort liability, not jurisdiction, as New York appellate cases have held, (2) the exercise of an imputed jurisdictional theory does not comport with federal due process, and, in any event (3) it assumes SGBL's predecessor, LCB, would be subject to personal jurisdiction, which is not so given post-*Licci* developments in this Circuit.

## 1. Successor liability allegations do not create and confer personal jurisdiction over a defendant in the first instance

A defendant's alleged successor liability is not a basis for exercising personal jurisdiction. As courts in New York have succinctly stated, the principles and common law exceptions under which a corporate successor may be subject to liability for the torts of its predecessor "deal with the concept of tort liability, not jurisdiction." *BRG Corporation v. Chevron U.S.A., Inc.*, 163 A.D.3d 1495, 82 N.Y.S.3d 798, 799 (App. Div. 4th Dep't 2018); *see also Semenetz v. Sherling & Walden, Inc.*, 21 A.D.3d 1138, 801 N.Y.S.2d 78 (App. Div. 3d Dep't 2005), *aff'd on other grounds* 7 N.Y.3d 194, 818 N.Y.S.2d 819, 851 N.E.2d 1170 (2006).  In other words, a successorship theory

is applicable only as a means of establishing a defendant's *liability* and an independent basis for exercising personal *jurisdiction* over an alleged successor is required.

In *BRG*, for example, "plaintiffs contend[ed] that personal jurisdiction exists over defendant because it ostensibly bears successor liability for a predecessor corporation that was itself subject to personal jurisdiction in New York." 82 N.Y.S.3d at 799.[8] The trial court accepted this imputation theory and denied defendant Valero Energy Corporation's ("VEC") motion to dismiss for lack of personal jurisdiction. *BRG* Dec. at 4-5 (finding "the existence of facts to suggest that VEC is a successor-interest and as such this Court has personal jurisdiction over it").

The Fourth Department unanimously reversed, agreeing with another New York appellate department that allegations of successor liability were insufficient to show personal jurisdiction, and instead only could be used to impose liability in a jurisdiction where personal jurisdiction could independently be found:

> The Third Department, however, expressly rejected that jurisdictional theory in *Semenetz* (*see id*. at 1140, 801 N.Y.S.2d 78). The "successor liability rule[s]," wrote the *Semenetz* court, "deal with the concept of tort liability, not jurisdiction. When and if [successor liability] is found applicable, the corporate successor would be subject to liability for the torts of its predecessor in any forum having *in personam* jurisdiction over the successor, but ***the [successor liability rules] do not and cannot confer such jurisdiction over the successor in the first instance***" (*id.*).

82 N.Y.S.3d at 799 (emphasis added).

Notably, the underlying trial court decision shows that the basis for successorship was a merger between VEC and another company. *BRG* Dec. at 4 ("in merger documents between VEC and Ultramar Diamond Shamrock Corporation, the 'effects of the merger' were described as VEC

---

[8] *BRG* involved an appeal from an order of the Supreme Court, Monroe County (William K. Taylor, J.), entered September 22, 2017. Because the Decision and Order ("*BRG* Dec.") is not available on-line, SGBL attaches a faxed copy to the Sullivan Declaration as Exhibit D. As discussed *infra* at p. 18 n. 10, facts in the Decision cast serious doubt over the correctness of *dicta* in a recent Second Circuit case regarding the interplay between successor liability and personal jurisdiction in the context of a merger (which is relevant but not the case here).

assuming 'all debts, liabilities and duties of [Ultramar Diamond Shamrock Corporation.]'"). Even so, the appellate court ruled that the circumstances could not and did not permit the exercise of personal jurisdiction over the alleged successor.

As noted in *BRG*, the Third Department in *Semenetz* reached the same conclusion, reversing a trial court ruling that had held that "inasmuch as [the predecessor] was subject to long-arm jurisdiction … [the purchaser of "all of its assets, including goodwill, trade names and inventory"] likewise was subject to such jurisdiction as the successor." *Semenetz*, 801 N.Y.S.2d at 80, 81.[9] The New York appellate courts' holdings in *BRG* and *Semenetz* are sound and show that Plaintiffs' claimed basis for personal jurisdiction over SGBL – imputation of LCB's jurisdictional contacts based upon an express assumption of liabilies – lacks merit and provides no basis for the exercise of personal jurisdiction over SGBL.[10]

---

[9] The New York Court of Appeals affirmed but did not reach the personal jurisdictional issue. In that declination, however, the Court suggested that imputation of personal jurisdiction would only be appropriate if the successor is "substantively responsible" for the tort. *See Semenetz*, 7 N.Y.3d at 199 ("Because we do not adopt the 'product line' exception, we need not and do not address plaintiff's argument that personal jurisdiction may properly be imputed to a successor corporation whenever it is substantively responsible for its predecessor's allegedly tortious conduct.").

[10] To the extent Plaintiffs' seek to rely on *dicta* in *United States Bank National Association v. Bank of America N.A.*, 916 F.3d 143 (2019) ("*U.S. Bank*"), it is entirely misplaced. The majority opinion in that case explicitly limited its view of any jurisdictional imputation to instances where there has been a merger and there is one "entity that survives the merger." *U.S. Bank*, 916 F.3d at 155; *see, e.g., id.* at 157 ("while the holding of *Semenetz* was that successor liability on the basis of … exceptions to successor-nonliability does not confer on the successor the jurisdictional status of the predecessor, the decision explicitly recognizes that the rule is otherwise when the successor status results from merger with the predecessor"). Even if the majority's views regarding merger is a correct statement of New York law (which the concurring opinion doubted and which *BRG* shows is not the case), there is no merger between SGBL and LCB as a matter of law here because the purported successorship flows from an all-cash, no-stock purchase by SGBL of certain LCB's assets and liabilities, arising from a competitive bidding process, without any allegation of continuing ownership by LCB or its shareholders (directly or indirectly) after the transaction, with two separate entities existing after the transaction, and with SGBL exercising no control, oversight, or corporate relationship with LCB afterwards. *See Cargo Partner*, 352 F.3d at 47 ("Because there is no continuity of ownership here, the asset purchase was not a merger ... called something else.") (internal quotations omitted); *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244-45, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983) (no merger exists where predecessor survives the transaction as "a distinct, albeit meager, entity"); *TBA Glob., LLC v. Fidus Partners, LLC*, 132 A.D.3d 195, 210, 15 N.Y.S.3d 769, 780 (App. Div. 1st Dep't 2015) ("We agree with the Second Circuit that, under New York law, continuity of ownership is the touchstone of the de facto merger concept and thus a necessary predicate to a finding of de facto merger.") (citations and internal quotation marks omitted); *Vasquez v. Ranieri Cheese Corp.*, 2010 WL 1223606, at *13 (E.D.N.Y. Mar. 26, 2010) ("there is no continuity of ownership where assets are purchased solely with cash") (citation omitted). And while there are instances where a successor may "inherit" the jurisdictional status of its predecessor under New York law, it is for independent jurisdictionally-significant reasons (such as an assumption of contract) and not simply because a predecessor's liabilities may have been assumed.

**2.** **The exercise of "successor personal jurisdiction" here would not comport with federal due process principles**

The exercise of personal jurisdiction over SGBL by imputing LCB's earlier jurisdictional contacts based exclusively on a foreign asset purchase agreement that has no connection to New York or the United States would not comport with federal due process principles. *See Waldman*, 835 F.3d at 331, 343. Not only would this impermissibly base specific personal jurisdiction on SGBL's out-of-state conduct, or on a third party's conduct with the forum, but it would violate the principle that a plaintiff's suit cannot "arise out of or relate to" a defendant's forum contacts unless those contacts in some way caused the plaintiff's injury.

The Supreme Court has long held that that personal jurisdiction must be based on the contacts the *defendant* has with the forum. *See Daimler AG*, 571 U.S. at 127 (for purposes of general jurisdiction, the defendant essentially must be "at home" in the forum); *Waldman*, 835 F.3d 335 (for purposes of specific jurisdiction, the relationship "must arise out of contacts that the 'defendant *himself*' creates with the forum State") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original). This makes sense because due process limits "principally protect the liberty of the nonresident defendant." *Walden*, 571 U.S. at 284; *see also Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("[t]he requirements of *International Shoe* . . . must be met as to each defendant"). Here, SGBL – and not LCB – is the defendant in this case, and any jurisdictional conduct should be limited to that of SGBL.

Decisions recalibrating and significantly limiting both general and specific personal jurisdiction further confirm that personal jurisdiction *cannot* be based upon the conduct of agents or other third parties. *Daimler*, 571 U.S. at 134-36 (general jurisdiction cannot be based on imputed contacts of subsidiaries to corporate parents, often referred to as "agency jurisdiction"); *Walden*, 571 U.S. at 285 (Supreme Court has "consistently rejected attempts to satisfy the

- 19 -

defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State").  Imputing LCB's tortious conduct to SGBL in this case for jurisdictional purposes would represent the "unilateral activity of another party or a third person," violating due process.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *see Burger King Corp.*, 471 U.S. at 475 (same); *see Walden*, 571 U.S. at 284 (same).

Jurisdiction by imputation also is squarely at odds with principles underlying specific personal jurisdiction where courts focus on "the relationship among the defendant, the forum, and the litigation."  *Walden*, 571 U.S. at 284 (citations omitted); *SPV Osus Ltd.*, 882 F.3d at 344.  To comport with due process, a defendant must "have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State." *U.S. Bank*, 916 F.3d at 150 (quoting *Bristol-Myers Squibb Co. v. Super. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1785 (2017)).  Due process also requires that "the plaintiff's claim must arise out of or relate to the defendant's forum conduct."  *U.S. Bank*, 916 F.3d at 150 (*quoting Bristol-Myers Squibb*, 137 S. Ct. at 1786).

It is undisputed that neither SGBL independently, nor SGBL and LCB together, engaged in any jurisdictionally relevant acts, that is, took any action in New York or the U.S. related to SGBL's purchase of certain assets and liabilities of LCB.  Nor did SGBL take any act in New York or the U.S. that has any causal connection to Plaintiffs' injuries.  Plaintiffs' theory therefore fails the jurisdictional tests because: (1) SGBL did not purposefully avail itself of any law or benefit in New York, or purposefully direct any conduct to the United States; and (2) Plaintiffs' ATA claim to impose LCB's liability on SGBL did not arise out of or relate to any of SGBL contacts in the forum.  Indeed, Plaintiffs cannot point to *any* SGBL conduct that has any relationship to New York or the U.S. with perhaps the exception of SGBL's alleged use of N.Y. correspondent accounts,

which has *nothing* to do with the SPA, LCB's alleged tortious conduct many years ago, or Plaintiffs' injuries. *Waldman*, 835 F.3d at 335 (quoting *Walden*, 571 U.S. at 284). Under such circumstances, the exercise of personal jurisdiction would violate due process. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (defendants cannot be made to answer "with respect to matters unrelated to the forum connections"); *Walden*, 571 U.S. at 283 (due process "constrains a State's authority to bind a nonresident defendant to a judgment of its courts.") (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286, 291 (1980)).

Finally, due process principles seek to foster predictability and to permit out-of-state defendants "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Daimler*, 571 U.S. at 139 (quoting *Burger King Corp*., 471 U. S., at 472) (internal quotation marks omitted). The Supreme Court has warned that these protections are especially important where foreign corporations are involved. *Daimler*, 570 U.S. at 138-40. Application of a jurisdictional imputation theory here would undermine these important goals and have the potential of subjecting foreign asset purchasers to personal jurisdiction in the U.S. whenever and wherever it acquires a liability of another company, whether that company is a U.S. corporation or not, and whether or not the asset purchase itself has any connection to the U.S. Such a sweeping theory cannot be reconciled with due process.

### 3. Under existing law, the FAC allegations are no longer sufficient to show personal jurisdiction over LCB

This Court need not reach this issue, but under an imputation theory, this Court only can exercise jurisdiction over SGBL if LCB itself would be subject to personal jurisdiction. Plaintiffs contend that because the Second Circuit in *Licci* determined that LCB's conduct rendered it subject to personal jurisdiction in the New York, SGBL also is subject to personal jurisdiction. FAC ¶16.

Since *Licci*, the Second Circuit has clarified that, where, as here, the in-forum contacts are limited, a plaintiff must show a *proximate causal relationship* between those contacts and the harm complained of.  *See SPV Osus Ltd.*, 882 F.3d at 344 (requiring a showing of proximate causation to establish specific jurisdiction where the defendant has had limited contacts with the forum).  Because the FAC allegations do not plausibly show that the alleged correspondent banking activity proximately caused the attacks at issue a court could not exercise specific jurisdiction over LCB and, by extension, SGBL.

## II.    PLAINTIFFS ARE BARRED FROM PURSUING SUCCESSOR LIABILITY CLAIMS AGAINST SGBL

Plaintiffs' successor claims against SGBL based on LCB's conduct and purported liability arising from the Hezbollah rocket attacks in 2006 is triply barred by claim preclusion, issue preclusion, and judicial estoppel.  The first two related doctrines "preclude parties from contesting matters that they have had a full and fair opportunity to litigate," thereby conserving judicial resources and minimize the possibility of inconsistent decisions.  *Montana v. United States*, 440 U.S. 147, 153–54 (1979).  The third doctrine seeks to "preserve the sanctity of the oath" and "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings."  *Simon v. Safelite Glass Corp*, 128 F.3d 68, 71 (2d Cir. 1997) (quoting *Bates v. L.I.R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993)).  Each applies here to bar Plaintiffs' claims.[11]

---

[11] As a matter of judicial sequencing, it is unclear whether this Court must resolve the personal jurisdiction question before reaching the preclusion question.  In *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007), the Supreme Court held that a court is not required to establish jurisdiction before dismissing a case on non-merits grounds, since such a dismissal "means that the court will not proceed at all to an adjudication of the cause."  *Id*. at 431 (internal quotation marks omitted).  To the extent preclusion is merely "a determination that the merits [have already been] adjudicated elsewhere," *Id*. at 432, and not technically a judgment on the merits, this Court may bypass the jurisdictional question.  *See Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948) ("If the doctrine of res judicata is properly applicable . . . the case may be disposed of without reaching the merits of the controversy.").  Having said that, SGBL is aware of one order in this Circuit that concluded that a dismissal based upon preclusion may not be on non-merits grounds.  *See Siegel v. Apergis*, 610 Fed. App'x 15, 16 (2d Cir. 2015) (summary order) ("Issue and claim preclusion go to the merits of a claim, which a court cannot adjudicate in the absence of [subject matter] jurisdiction.").

### A. Claim Preclusion Bars Plaintiffs' ATA Claims Against SGBL Based Upon Successor Liability

Plaintiffs are precluded from litigating their ATA claims against SGBL based on successor

liability because of the prior decision in *Kaplan v. LCB*, in which Judge Daniels dismissed ATA

liability claims based on the same conduct against LCB, SGBL's alleged predecessor/privy.  *See*

405 F. Supp. 3d. at 525.

> Consistent with the earlier comparison of operative complaints, Judge Daniels observed:
>
> This action arises out of a series of rocket attacks carried out by Hizbollah in Israel between July 12 and August 14, 2006. (SAC ¶ 4.)
>
> * * *
>
> Plaintiffs allege that between at least 2004 through July 2006, Defendant maintained bank accounts (the "LCB Accounts") for Hizbollah under the names of two Hizbollah leaders and three "subordinate entities" created and wholly controlled by Hizbollah (the "Five Customers"). (Id. ¶¶ 21, 23, 37–39.)

*Kaplan*, 405 F. Supp. 3d. at 528-29.   After analyzing the primary and secondary

(conspiracy and aiding and abetting) ATA claims against LCB, Judge Daniels dismissed

them in their entirety:

> Plaintiffs here fail to sufficiently allege that Defendant committed any act of "international terrorism" or that their injuries were proximately caused by Defendant's actions. Accordingly, Plaintiffs' claim of primary liability under § 2333(a) must be dismissed.
>
> * * *
>
> Here, Plaintiffs fail to plausibly allege that Defendant, when processing the wire transfers, conspired with or aided and abetted Hizbollah in perpetrating the rocket attacks.

*Id.* at 531, 534.

In this Circuit, the doctrine of claim preclusion applies and bars re-litigation if: "(1) the

previous action involved an adjudication on the merits; (2) the previous action involved the

plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or

- 23 -

could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). The elements are all satisfied here.

As to the first element, *Kaplan* unquestionably involved an adjudication on the merits. As noted, it is now on appeal. As to the second element, the FAC alleges that SGBL is LCB's successor-in-interest by virtue of the SPA; the parties therefore by definition are in privity. *See, e.g., Russell v. SunAmerica Securities*, 962 F.2d 1169, 1176 (5th Cir. 1992) (applying res judicata to bar second suit against alleged successor based on the same cause of action as litigated in first suit against alleged predecessor).

The FAC also shows that 18 of the plaintiffs in this case were plaintiffs in *Kaplan*. The few, additional plaintiffs in *Lelchook* represent the members of the Lelchook family (two of which are suing in multiple capacities) and three American nationals who resided in Israel during the Second Lebanon War. For claim preclusion purposes, this Court may take judicial notice of the fact that these remaining plaintiffs are represented by the same counsel as the *Kaplan* Plaintiffs, share the same legal interest as the *Kaplan* Plaintiffs, and, irrespective of their own injuries or circumstances, must prove that LCB is liable under the ATA for the Hezbollah attacks to prevail on their claims. *See Alpert's Newspaper Delivery Inc. v. New York Times Co.*, 876 F.2d 266 (2d Cir. 1989) ("since the two groups were using the same attorneys in the two actions, the allegations were identical, and there were indications of an industry-wide strategy … sufficient identity of parties existed to bar relitigation of previously raised claims") (citing *Ruiz v. Commissioner of Dept. of Transportation of the City of New York*, 858 F.2d 898 (2d Cir. 1988)); *see also Senatore v. Ocwen Loan Servicing, LLC.*, 2017 WL 3836056, *4 (S.D.N.Y Aug. 31, 2017) ("all parties…need not be in privity with all parties implicated in the prior action; it requires only that the parties…have…their interests 'adequately represented' in the prior litigation") (citing

*Monahan*, 214 F.3d at 285).  This should be sufficient to preclude a second action as a defendant or his privy should not be forced to re-litigate the same claim over and over again, particularly where a plaintiff's counsel may have elected not to include a known plaintiff at the commencement of a lawsuit, or elected not to amend a complaint to add a discovered plaintiff during its pendency.

As to the third element – whether the claims asserted in the second lawsuit (here, successor liability claims against SGBL) was, *or could have been*, raised in the prior action – courts consider whether the second lawsuit concerns "the same claim – or nucleus of operative facts – as the first suit," applying three considerations: "(1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations." *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008) (internal quotation marks omitted).  This is important because claim preclusion "is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event." *N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84, 88 (2d Cir. 2000) (citation omitted).

The successor liability claims against SGBL plainly arise from the same nucleus of operative facts in *Kaplan* because, in addition to proving that SGBL is liable as successor-in-interest for LCB's alleged tortious conduct, Plaintiffs must prove that LCB's conduct violated the ATA.  That, of course, was the ultimate question decided in *Kaplan*.  And while there may be additional facts relevant to determining SGBL's liability as a successor, "the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit.  It is instead enough that 'the facts essential to the second were [already] present in the first.'" *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 110-11 (2d Cir. 2000) (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir.1997) (emphasis in *Waldman* omitted)).

There also can be no question that addressing all the claims at once would form a "convenient trial unit" and "conform[] to the parties' expectations" because Plaintiffs' factual allegations surrounding LCB's conduct and the role Hezbollah played in the attacks at issue are identical. *Channer*, 527 F.3d at 280. Indeed, it seems clear that if Plaintiffs wanted to hold SGBL liable for LCB's alleged tortious conduct arising from these attacks, they were required to name SGBL as a defendant at that time. Having failed to do so (and, moreover, lost on the merits of the claim of LCB's ATA liability), the instant claims are barred. *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir. 1997) ("Once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.") (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981)).

### B. Issue Preclusion Bars Plaintiffs' Attempt To Re-Litigate LCB's Liability

For many of the same reasons, Plaintiffs are precluded from pursuing their successor liability claims against SGBL on the grounds of issue preclusion. This also arises as a natural consequence of Judge Daniels' rulings in *Kaplan v. LCB*.

As the Second Circuit stated in *Licci* previously:

> A party is collaterally estopped from raising an issue if "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012).

*Licci v. Lebanese Canadian Bank SAL*, 659 Fed.Appx. 13 (2016). In particular, "[d]efensive use of collateral estoppel occurs when a defendant seeks to prevent a plaintiff from re litigating an issue the plaintiff has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984).

Each of the elements of issue preclusion has been met here. To establish SGBL's successor liability, Plaintiffs must establish LCB's primary and/or secondary liability under the ATA for

injuries caused by the Hezbollah rocket attacks in 2006 based upon LCB's provision of banking services to Five Customers.  Resolution of these questions include whether LCB's provision of wire transfers constitutes international terrorism, whether such conduct is the proximate cause of Plaintiffs' injuries, whether an unlawful agreement existed between LCB and Hezbollah, and whether LCB knowingly play a role in terrorist activities, among others.  These are the same issues that were raised, actually litigated, and resolved in *Kaplan*.  This amply satisfies the first two elements of issue preclusion.

As for the third element, although the scope of collateral estoppel traditionally had been limited by the doctrine of mutuality of parties under which neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment, that is no longer strictly the case.  *See generally Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979); *id.* at 331 (courts wield broad discretion to determine when doctrine should be applied).  Here, the *Kaplan* Plaintiffs unquestionably had "a full and fair opportunity" to litigate the issue; in fact, they and their counsel have been litigating LCB's liability for its alleged role in the rocket attacks in courts in the Second Circuit for the past ten years.  That should be sufficient for the doctrine to apply.  *See M.O.C.H.A. Soc'y Inc. v. City of Buffalo*, 689 F.3d 263, 285 (2d Cir. 2012) ("Despite the absence of complete privity between the named plaintiffs in the two actions, 'sufficient identity exists between the plaintiffs' for the district court to apply collateral estoppel and to bar litigation") (quoting *Alpert's Newspaper Delivery Inc.*, 876 F.2d at 271); *Frydman v. Ackerman*, 280 F. Supp. 3d 418, 425 (S.D.N.Y. 2017) ("'complete privity' is not required for a party to have been adequately represented in a previous proceeding") (quoting *M.O.C.H.A Soc'y Inc.*, 689 F.3d at 285)).

Last, Plaintiffs cannot seriously contend that the fourth element is lacking because the resolved issues are at the core of Judge Daniels' rulings in *Kaplan* – a decision that is a final judgment for purposes of claim preclusion. *See Licci*, 659 F. Appx. at 16.

### C. Judicial Estoppel Bars Plaintiffs' Successor Liability Position

Plaintiffs' successor liability claims additionally are barred by judicial estoppel. "Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding." *Simon*, 128 F.3d at 71; *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]").

In this Circuit, a party may be judicially estopped where two factors are satisfied: "1) a party's later position is 'clearly inconsistent' with its earlier position" and "2) the party's former position has been adopted in some way by the court in the earlier proceeding." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (citation omitted). That standard is met here.

First, in *Kaplan*, Plaintiffs took the position that LCB was entirely liable for its own earlier tortious conduct. In contrast, Plaintiffs now take the (inconsistent) position that LCB has *no* liability for its conduct because SGBL assumed all of its liabilities in the asset purchase. Next, Plaintiffs' position was adopted by Judge Daniels who proceeded to adjudicate the merits of the dispute against LCB to final judgment. Now Plaintiffs and their counsel, hoping for a better result, seek to undermine that decision by arguing that the *Kaplan* decision essentially means nothing and that SGBL must re-litigate and defend LCB's ATA liability before this Court. Such a deliberate tactic and change of position compromises judicial integrity and should not be permitted.

\* \* \*

- 28 -

If this Court does not apply one (or more) of the doctrines discussed above, a duplication of proceedings would most certainly ensue, with an attendant waste of judicial resources and risk of inconsistent results.  This is precisely what these equitable doctrines seek to prevent.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

### A. The ATA Does Not Authorize A Successor Liability Action Against An Asset Purchaser

Even assuming this Court has personal jurisdiction over SGBL and Plaintiffs are not barred from suing SGBL, the FAC should be dismissed because there is no successor liability provision in the ATA granting a private right of action or theory of recovery against an asset purchaser.

#### 1.  <u>The text of the ATA does not explicitly create successor liability</u>

The ATA makes no specific mention of successor liability.  Instead, Congress authorized federal courts to hear claims and impose liability only against two categories of culpable defendants – any individual or entity directly responsible for "acts of international terrorism," or any individual or entity "who aids and abets" or "conspires" with that terrorist. 18 U.S.C. §§ 2333(a), (d).  Successor asset purchasers like SGBL do not qualify under the statutory language defining either liability.  Because Congress in the ATA did not mention, let alone explicitly authorize, liability against a successor *who had no knowledge and played no role whatsoever in the attacks causing injuries*, the claim or theory is unavailable.  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, N.A., 511 U.S. 164, 165 (1994) (statutory silence on the subject means there is none); *cf. Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 452 (2002) ("Where Congress wanted to provide for successor liability in the Coal Act, it did so explicitly").

Indeed, when faced with a similar question whether to impliedly expand the ATA's scope beyond what was plain in the text, this Circuit declined:  Congress's "statutory silence on the subject of secondary liability means there is none." *Rothstein v. UBS AG*, 708 F.3d 82, 98 (2d Cir.

- 29 -

2013); *see also Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (*en banc*) ("statutory silence on the subject of secondary liability means there is none; and section 2333(a) … does not mention aiders and abettors or other secondary actors").  The crux and lesson of *Rothstein* is that the authority to adjudicate and impose civil liability – whether secondary or successor – on a new category of actors – whether aiders and abettors or successors – must be found in the statute's text.  *Rothstein*, 708 F.2d at 82.  So just as Congress's silence meant that it did not authorize ATA *secondary* liability actions prior to JASTA, Congress's silence here means it has not authorized *successor* liability actions, especially those adjudicating foreign rights.

### 2. The presumption against extraterritoriality bars implication of a private right of action against an asset purchased based on successor liability

Nor should this Court imply a private right of action or remedy against an asset purchaser in the ATA, which would have the effect of applying U.S. law to a foreign asset purchase transaction between two foreign entities and potentially imposing a new federal substantive legal liability on a foreign corporation.  The presumption against extraterritoriality precludes that result.

Where, as here, a federal statute is not purely domestic in application, the presumption against extraterritoriality is the relevant, fundamental background principle to be applied, and not any other "traditional rule[s]," such as common law principles.  *RJR Nabisco, Inc. v. European Community ("RJR")*, 136 S. Ct. 2090, 2109 (2016).  To respect this interpretive cannon, courts must adopt a bright-line rule that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).[12]  The

---

[12] The Supreme Court recently has applied the presumption against extraterritoriality to preclude implication of a private right of action or remedy in a variety of contexts, including those based on the common law.  *See Morrison*, 561 U.S. at 255 (applying presumption to the Securities Exchange Act of 1934); *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) (applying the presumption to find no federal common law cause of action under the Alien Tort Statute); *RJR*, 136 S. Ct. at 2090 (applying the presumption independently to aspects of federal statute and finding a private cause of action does not apply abroad); *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1410 (declining to find common law corporate liability under the Alien Tort Statute).

rule is implicated with respect to the ATA because "[w]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *RJR*, 136 S. Ct. at 2102 (citing *Morrison*, 561 U. S., at 265); *see also RJR*, 136 S. Ct. at 2101 ("The scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application"); *Small v. U.S.*, 544 U.S. 385, 388-89 (2005) (while Congress has the power to impose liability for acts that occur abroad, it must make the extraterritorial scope of a statute clear).

For ATA liability, Congress has specifically granted federal courts jurisdiction to reach certain acts of international terrorism against U.S. nationals. *See* 18 U.S.C. § 2333(a) (authorizing civil action for injury "by reason of an act of international terrorism"); 18 U.S.C. § 2333(d) (secondary liability for "an injury arising from an act of international terrorism"); 18 U.S.C. § 2331(1) (defining the term "international terrorism"). Congress has not, however, instructed U.S. law to apply beyond the (evil) conduct constituting "acts of international terrorism" to reach and adjudicate matters of (business) conduct, such as a foreign asset purchase transaction or other corporate law matters between two foreign entities. *RJR,* 136 S. Ct. at 2100 (the question is not whether a court thinks "Congress would have wanted" a statute to apply to foreign conduct "if it had thought of the situation," but whether Congress has affirmatively and unmistakably instructed that the statute will do so) (quoting *Morrison*, 561 U.S. at 261).

Congress's careful and deliberate limitations regarding private liability under the ATA is not surprising given its extraterritorial implications. As the United States has observed, when it comes to the ATA, "other important interests" – including the "the United States' vital interest in maintaining close cooperative relationships with . . . [various non-US] partners in the fight against terrorism" – "are at stake." Brief of the United States as Amicus Curiae, *Arab Bank, PLC v. Linde*,

No. 12-1485, 2014 WL 2191224, at *18-9 (U.S. May 23, 2014).  In the absence of the necessary, explicit Congressional guidance, the ATA does not extend to corporate law matters abroad, including those surrounding a foreign asset purchase agreement (like the SPA here) between two foreign corporations.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) (decision to imply or create an implied right of action in a federal statute where Congress has not directly spoken is "better left to legislative judgment in the great majority of cases") (citing *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001)); *Jesner*, 138 S. Ct. at 1402 (plurality opinion) (there is much "doubt on the authority of courts to extend or create private causes of action [against corporations] even in the realm of domestic law," let alone foreign corporations).

### 3.    The ATA's text, structure, legislative history, and purpose shows no intent to create successor liability

To the extent the lack of explicit authorization in the ATA and the application of presumption against extraterritoriality does not end this Court's inquiry, there is no indication that Congress intended to authorize courts to adjudicate and impose successor liability in the ATA, let alone affirmatively and unmistakably intended to do so and for it to apply abroad.  Typically, courts look to the following factors to determine whether Congress intended to create a right or remedy in a federal statute: (1) the language of the statute itself, (2) the structure of the statutory scheme, (3) the statute's legislative history, (4) the underlying purpose and identity of the statute's intended beneficiaries, and (5) other constitutional and prudential considerations. *Cannon v. University of Chicago*, 441 U.S. 677, 689 (1979); *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO.*, 451 U.S. 77, 91 (1981); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639 (1981).

The Supreme Court has warned, however, that: "In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to

construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines, Inc.*, 451 U.S. at 97. Here, each of the factors above shows that Congress intended the ATA to reach only culpable actors involved in terrorism or terrorism-related activities, and not successors.

### a. The ATA's plain language extends only to primary and secondary liability

The ATA does not explicitly create a private action or remedy based on successor liability, and instead expressly creates and authorizes only primary and secondary liability actions against culpable actors involved in terrorism or terrorism-related conduct. 18 U.S.C. §§ 2333(a) (creating liability for committing "act of international terrorism"), 2333(d) (creating liability for "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with …"). Of course, by definition, a successor-in-interest neither committed the earlier terrorist act, nor aided and abetted or conspired with a terrorist/FTO to commit that act as the text requires.

### b. The ATA's structure and liability provisions contradict an intent to impose successor liability on an asset purchaser

The structure of the ATA shows that Congress did not intend the civil liability provisions to apply to a foreign asset purchaser for three reasons. *First*, to be liable under the ATA, a defendant must harbor a terrorist intent. *See infra* at 41-42. This intent element is lacking with respect to a successor asset purchaser who played no role in the alleged misconduct.

*Second*, the ATA provides for treble damages. 18 U.S.C. § 2333(a). Such damages, "not being compensatory, tend to have a punitive aim." *Boim*, 549 F.3d at 692; *Texas Industries, Inc.*, 451 U.S. at 639 ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct."). Punitive damages are seldom if ever imposed unless the defendant is found to have engaged in circumstances showing serious wrongdoing and culpability. *Boim*, 549 F.3d at 692; Prosser on Torts, § 2 at pp. 9-10. The imposition of treble damages on an asset

purchaser who engaged in no deliberate wrongdoing, let alone conduct that would justify punitive damages, cuts squarely against a finding that Congress intended the ATA to apply to a successor.

*Third*, the presence of an elaborate enforcement and damages mechanism in the ATA contradicts any legislative intent to create additional private remedies. As "a comprehensive statutory and regulatory regime" designed to combat terrorism and terrorism-financing, the ATA "reflect[s] the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism." *Jesner*, 138 S. Ct. at 1405 (plurality opinion). The ATA's criminal, as well as civil remedies and treble damages, thus "strongly evidences an intent not to authorize additional remedies." (quoting *Northwest Airlines*, 451 U.S. at 93-94 and citing *Texas Industries*, 451 U.S. at 639).

### c. The ATA's legislative history shows that Congress intended to impose liability only on culpable actors

The ATA's legislative history (both as enacted and as amended by JASTA) further confirms the conclusion that Congress did not seek to impose liability against a successor asset purchaser. Most fundamentally, the U.S. Senate Report reauthorizing the ATA explains Congress's intent in creating a remedy against those ***responsible for acts of terrorism***:

> Title X would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed. By its provisions for compensatory damages, treble damages, and the imposition of liability ***at any point along the causal chain of terrorism***, it would interrupt, or at least imperil, the flow of money.

S. REP. 102-342, S. Rep. No. 342, 102ND Cong., 2ND Sess. 1992, 1992 WL 187372 (Leg. Hist.) P.L. 102-572, at 27 (emphasis added). While Congress intended to provide compensation to victims, "the imposition of liability" and recovery of money was to be from those "along the causal chain of terrorism." *Id.* A claim against a successor, based upon an arms-length purchase of assets, falls outside this stated intent.

- 34 -

Nor does anything in the legislative history of JASTA – the Justice Against **Sponsors** of Terrorism Act (emphasis added) – suggest that Congress was concerned with authorizing private civil suits with theories based upon successor liability.  To the contrary, JASTA chiefly added a theory of secondary liability, and statutory notes and statements do not suggest Congress intended to expand the ATA further to include successor liability through its new provisions or definitions. *See* 18 U.S.C. § 2333 Statutory Note (Findings § 7) (authorizing civil claims for providing support "to the persons or organizations responsible for their injuries"); *Id*. (Purpose) (authorizing relief against those who "have provided material support").

### d. The ATA's purpose, including its intended beneficiaries, does not support successor liability against an asset purchaser

Neither does the purpose of the ATA support a finding of a successor liability.

*First*, the justification that the lack of successor liability will defeat the purpose of the ATA likewise lacks a legal and factual basis.  As a legal matter, this type of argument has been made before in varying contexts and the Supreme Court has consistently found it insufficient as an interpretative tool.  *RJR*, 136 S. Ct. at 2110 (justification is merely an improper attempt to "divin[e] what Congress would have wanted"); *Morrison*, 529 U.S. at 261 (a court is not authorized to choose a construction of a statute even if it effectuates Congress' "overriding purpose" where the statute is unambiguous).  As a factual matter, the ATA private civil remedy provision without successor liability still does exactly what Congress intended:  to cut off money to terrorists in the causal chain of terrorism.  Beyond civil remedies, the Government also has a robust arsenal of antiterrorism tools, including criminal prosecutions, asset freezes, and export controls under the ATA and other statutes, which more directly advance antiterrorism law enforcement than their civil counterparts.  *See* 138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992); Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm. on the Judiciary, 101st Cong. 46-47 (1990).

*Second,* while it is true that the beneficiaries of ATA are victims of terrorist attacks, it does not follow that Congress intended – let alone clearly intended – to allow them to pursue and recover damages for their injuries from any available source. Indeed, there is no amount of money that can replace a loved one, and, for some families, a court-entered judgment or finding that a person, entity or organization is responsible may be more important than a monetary award. This sense of justice is neither achieved nor served by a judgment against an innocent successor.

*Third*, that successor liability may help ensure full compensation to a victim has been rejected as a justification for its implication. *See Semenetz,* 851 N.E.2d at 1174 (that the sale of assets and dissolution of the original company may destroy plaintiffs' remedies is "merely a statement of the problem" and an insufficient basis to find successor liability).

### 4. <u>No other circumstances justify the creation of a successor liability cause of action under a federal common law</u>

There are two narrowly drawn circumstances where a court may formulate new causes of action pursuant to the common law: "those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' and those in which Congress has given the courts the power to develop substantive law." *Texas Industries*, 451 U.S. at 640 (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Neither are present here. Private suits brought by private parties pursuant to a federal statute do not, without more, implicate uniquely federal interests, which "concern[] with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Industries*, 451 U.S. at 640-41, 642. Next, the authority of the courts to fashion new or additional remedies is circumscribed where, as here, Congress has enacted an extensive remedial scheme designed to enforce the statutory provisions at issue. *Id*. at 643-44 (noting a "sharp distinction

- 36 -

between the lawmaking powers conferred [on the federal courts] in defining violations and the ability to fashion the relief available to parties claiming injury").

* * *

In sum, while there are broad remedial domestic statutes (like CERCLA) where Congress has authorized damages for harm without regard to fault and knowledge, and where courts have implied successor liability, the ATA is not such a statute.  Its provisions apply extraterritorially and only to culpable actors.  A successor liability lawsuit against SGBL is therefore unavailable.

### B.  SGBL Is Not Liable For LCB's Alleged Tortious Conduct Committed Prior To The Asset Purchase

Even assuming the ATA somehow authorizes a lawsuit based upon successor liability, the amended complaint fails to state a claim because it is well settled that, as an asset purchaser, SGBL is not liable for LCB's alleged torts prior to the transaction.[13]

### 1.  <u>The long-standing rule is that a corporation that acquires the assets of another is not liable for the torts of the predecessor</u>

New York takes a somewhat dim view of successor liability.  *See Semenetz*, 851 N.E.2d at 1174 ("extending liability to the corporate successor places responsibility" on the wrong party); *id*. at 1175 (rejecting a "product line" exception whose adoption "would mark 'a radical change from existing law implicating complex economic considerations better left to be addressed by the Legislature.'") (citations omitted).  New York follows the traditional rule that "a corporation which acquires the assets of another is not liable for the torts of the predecessor corporation," except under certain narrow circumstances.  *Semenetz*, 851 N.E.2d at 1172.  "These exceptions arise

---

[13] If this Court implies the availability of a successor liability cause of action or remedy under the ATA, there remains a question as to its content.  Here, assuming it could apply to foreign corporation – a  point we do not concede – the traditional common law rule in the United States and in New York is that generally an asset purchaser (the "successor") does not become liable for any of the liabilities of the seller (the "predecessor") arising prior to the transfer.  *See U.S. v. Bestfoods*, 524 U.S. 51 (1998) (in the absence of statutory authorization, courts are not free to impose federal statutory liability under standards that depart from the well-established principles of common law).  Because the standards are not materially different and there is no justification for displacing state law, for the purposes of this memorandum SGBL looks to New York law, but reserves the right to argue the law of another jurisdiction applies.

where a successor corporation "expressly or impliedly assume[s] [its] predecessor's tort liability"; or "there [is] a consolidation or merger of seller and purchaser"; or "the purchasing corporation [is] a mere continuation of the selling corporation"; or "the transaction is entered into fraudulently to escape such obligations." *Id.* (citing *Schumacher*, 59 N.Y.2d at 245)).  The FAC fails to state a claim against SGBL here because it does not allege facts plausibly showing that any exception to the non-liability rule applies.

### 2.  <u>None of the exceptions to the non-liability rule for an asset purchaser apply here</u>

The FAC fails to allege facts plausibly showing that any of the four exceptions to the non-liability rule applies to SGBL's good-faith asset purchase.[14]

### a.  The assumption of liability exception does not apply because SGBL did not expressly or impliedly assume LCB's ATA-related liabilities connected to Plaintiffs' injuries

The underpinning of Plaintiffs' successor liability claims is that SGBL is responsible for all of LCB's past conduct and assumed LCB's alleged ATA tort liability.  FAC ¶141.  This theory is fundamentally flawed for several reasons.  First, Plaintiffs' allegation is conclusory and belied by its own conduct in *Kaplan* and *Lelchook v. LCB*, discussed in detail, *supra* at 8-13, where it took the position that LCB was liable for its conduct.  Not once did Plaintiffs name SGBL as a defendant in those lawsuits.   Nor does the inclusion of a single paragraph from the SPA between LCB and SGBL – which lacks any context whatsoever – save this contradicted conclusory allegation.  *Id.* at ¶12.  Furthermore, even if SGBL assumed some of LCB's liabilities by virtue of the transaction, there is nothing beyond rank speculation to conclude that SGBL assumed any

---

[14] Plaintiffs bear the burden of proving successor liability. *See Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.*, 635 F.3d 48, 52 (2d Cir. 2011) ("Because the 'general rule' is that a purchaser of assets does not assume the predecessor's liability, it follows that the proponent of successor liability must offer proof that one of the [ ] exceptions to the general rule applies.").

particular LCB liability that is connected or has any relationship to any alleged injury in this case. Conspicuous by its absence is any allegation that any liability assumed by SGBL is connected to, let alone caused, any attack caused any injury in this case. Plaintiffs consequently fail to state non-conclusory facts plausibly showing this exception to the non-liability rule applies. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

### b. The *de facto* merger exception does not apply because there is no common ownership of LCB and SGBL after the purchase

Plaintiffs do not allege – because they cannot – that there is any common or continuity of ownership by LCB after the all-cash asset purchase by SGBL. This is fatal because New York law requires a showing of continuity of ownership to establish the existence of a *de facto* merger. *Cargo Partner,* 352 F.3d at 47 ("continuity of ownership is the essence of a merger" and "is what helps [] distinguish a merger from an asset sale"); *Vasquez,* 2010 WL 1223606, at *13 ("In harmony with this legal theory, courts have also held that there is no continuity of ownership where assets are purchased solely with cash.") (citation omitted); *Dritsas v. Amchem Products, Inc.*, 94 N.Y.S.3d 264, 265 (1st Dep't 2019) (exception inapplicable where assets purchased with cash and predecessor had no ownership).

### c. The continuation of the predecessor exception does not apply because there is no common ownership and LCB continues in existence today

Under New York law, successor liability under a continuation theory only attaches with "a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer." *See Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977); *see id*. (continuation envisions more of a reorganization, rather than a sale). "Some courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception." *Cargo Partner*, 352 F.3d at 45 n.3 (citations omitted). As with *de facto* merger, this exception is inapplicable because LCB continues

to exist and defend lawsuits, and there is no common ownership. *Dritsas v. Amchem Prod., Inc.*, 79 N.Y.S.3d 470, 476 (N.Y. Sup. Ct. 2018) ("the seller's survival in any form renders the mere continuation doctrine inapplicable"), *order reversed on other grounds*, 94 N.Y.S.3d 264, *supra*.

> **d. The fraudulent conveyance exception does not apply because the asset purchase was an arm's length transaction arising from a competitive bidding process**

The complaint does not allege any facts showing that the asset purchase was a fraudulent conveyance. The circumstances show the opposite. Am. Compl. ¶1448 ("SGBL was the winning bidder to acquire LCB"); *Bank v. Hydra Grp., LLC*, 2017 WL 6806665, at *8 (E.D.N.Y. Dec. 1, 2017), *reconsideration denied*, 2017 WL 9938286 (E.D.N.Y. Dec. 20, 2017), *and report and recommendation adopted*, 2018 WL 296092 (E.D.N.Y. Jan. 4, 2018) ("A transaction is not fraudulent if it is both an exchange for value and made in good faith.").

\* \* \*

Because Plaintiffs have not alleged facts showing that SGBL is liable for LCB's tortious conduct prior to the asset purchase, the successor claims must be dismissed.

## C. SGBL Has No Successor Liability Because Its Predecessor Has No Liability Under The ATA

Even if Plaintiffs can overcome all of the deficiencies discussed above (which they cannot), the FAC still must be dismissed because, as numerous federal courts have found (including with respect to LCB's specific alleged conduct here, *see Kaplan, supra*), the FAC allegations regarding LCB's provision of financial services simply do not state a claim of primary or secondary liability under the ATA. Because SGBL is only liable to the same extent as its predecessor, and LCB has none, the successor liability claims fail.

### 1. The Anti-Terrorism Act

"The Anti-Terrorism Act . . . is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing." *Jesner*, 138 S. Ct. at 1405 (plurality opinion).

As such, it "reflect[s] the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism." *Id.*; *see id.* at 1405 (declining "to displace this considered statutory and regulatory structure by holding banks subject to common-law liability").

18 U.S.C. Section 2333(a) creates a civil primary liability cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism."  Acts of "international terrorism," as defined in 18 U.S.C. § 2331(1), include activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (C) occur primarily outside the territorial jurisdiction of the United States.

To state a claim for primary liability pursuant to Section 2333(a), a plaintiff must therefore allege facts plausibly showing that the defendant itself committed an act of international terrorism, *i.e.*, an act that satisfies each definitional requirement.  *Linde*, 882 F.3d at 318.  A plaintiff also must allege injury "by reason of" the defendant's act of international terrorism, which under Second Circuit law, requires a showing of proximate cause.  *See Rothstein*, 708 F.3d at 95.

When originally enacted, Congress authorized "no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others." *Linde*, 882 F.3d at 319-20.  In 2016, Congress enacted JASTA that, among other things, amended the ATA to create aiding-and-abetting and conspiracy liability in certain narrow circumstances. *Id.* at 318, 320; 18 U.S.C. § 2333(d).  JASTA aiding-and-abetting is limited to cases in which the defendant "aids and abets, by knowingly providing substantial assistance [to] . . . the person who committed such an act of international terrorism.'"  *Linde*, 882 F.3d at 320 (alteration in original)

- 41 -

(quoting 18 U.S.C. § 2333(d)(2)).  As the Second Circuit has held, "aiding-and-abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.  Aiding-and-abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (emphasis in original).  To be liable under JASTA on a conspiracy theory, on the other hand, a defendant must have conspired to commit an act of international terrorism with the person who committed that terrorist act. *O'Sullivan*, 2019 WL 1409446, at *9.[15]

**2.  Plaintiffs fail to allege facts plausibly showing LCB has primary liability under the ATA**

**a.  The FAC fails to allege LCB committed an act of international terrorism**

Plaintiffs fail to allege that LCB itself committed an "act of international terrorism." *Linde*, 882 F.3d at 320.  As noted above, Section 2331 defines "international terrorism" as activities "involv[ing] violent acts or acts dangerous to human life" and  requires, among other things, that those acts "appear to be intended" to cause one of the enumerated illicit purposes of terrorism such as intimidating or coercing a civilian population. 18 U.S.C. §2331(1)(A), (B).  To state their claim for primary liability, Plaintiffs therefore must allege that LCB – as opposed to Hezbollah or the Five Customers alleged in the FAC – engaged in conduct that satisfies this statutory definition.

Plaintiffs here fall woefully short of meeting this standard because there is no allegation of violent conduct – just the provision of arms-length banking services to certain customers – and, furthermore, in no sense can those services be said to have been intended to "intimidate or coerce a civilian population." *Id*.; *see Kaplan*, 405 F. Supp. 3d. 533 (holding that "the provision of

---

[15] Congress included an act-of-war exception in the ATA that excludes from the private civil liability provisions certain harm arising from internationally-recognized armed conflicts. 18 U.S.C. § 2336(a).  SGBL reserves the right to argue that this also precludes LCB (and SGBL) liability should it become necessary in these proceedings.

financial services does not, in itself, equate to international terrorism"); *O'Sullivan*, 2019 WL 1409446, at *7 (finding implausible allegations that the provision of financial services to various Iranian banks and businesses with connections to terrorist organizations was dangerous to human life and intended to intimidate and coerce); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) ("While giving fungible dollars to a terrorist organization may be dangerous to human life, doing business with companies and countries that have significant legitimate operations is not necessarily so.") (internal quotation marks omitted).

In particular, Judge Daniels in *Kaplan* aptly observed that "even assuming, *arguendo*, that Defendant [LCB] was aware that it was providing such services to Hizbollah affiliates and that doing so violated economic sanctions imposed by the U.S. government," the plaintiffs had not plausibly alleged that this conduct "involve[d] violence or endanger[ed] human life' and [] 'appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government.'" *Kaplan*, 405 F. Supp. 3d. at 533 (quoting *Linde*, 882 F.3d at 326). The same of course can be said here.

This conclusion also makes good sense because there is an "obvious alternative explanation" (*Ashcroft v. Iqbal*, 556 U.S. 62, 682 (2009) (quoting *Twombly*, 550 U.S. at 567)) for LCB's provision of banking services to customers – to generate revenue and profit for its banking business. And terroristic intent cannot be presumed in the face of this clear commercial motivation. *See Kemper*, 911 F.3d at 390 ("To the objective observer, [the bank's] interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'"). Indeed, to hold otherwise also would contradict the premise of *Linde*, which recognized that even "the provision

- 43 -

of material support to a terrorist organization does not invariably equate to an act of international terrorism," as defined by the ATA. *Linde*, 882 F.3d at 326.[16]

### b. The FAC fails to allege proximate causation

To satisfy the proximate cause requirement for primary liability under the ATA, Plaintiffs must plausibly allege that (i) LCB's conduct led *directly* to Plaintiffs' injuries, (ii) LCB's conduct was a *substantial factor* in causing those injuries, and (iii) Plaintiffs' injuries were *foreseeable.* *Rothstein*, 708 F.3d at 91-92; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-24 (2d Cir. 2013) (referred to herein as *"Al Rajhi Bank")*. The FAC fails each standard.

In *Rothstein*, plaintiffs alleged that a financial institution (UBS) transferred U.S. banknotes (*i.e.*, physical currency) directly to "Iranian Government Organs" in violation of U.S. law. 708 F.3d at 87. The plaintiffs – victims of violence committed by Hezbollah or Hamas – sued UBS, asserting that these terrorist organizations received funding from Iran. The Second Circuit held that these claims were too indirect and attenuated to satisfy the proximate causation requirement. *Id*. at 96-97; *see also Al Rajhi Bank*, 714 F.3d at 124-25 (affirming for lack of proximate causation where bank defendants allegedly "provid[ed] routine banking services to organizations and individuals said to be affiliated with al Qaeda").

Not surprisingly, relying on *Rothstein*, Judge Daniels found allegations supporting the same primary liability claims against LCB failed to allege a proximate causal relationship between the funds transferred to the Five Customers and the attacks at issue. *Kaplan*, 405 F. Supp. 3d. at 529. Specifically, Judge Daniels ruled that there were no plausible allegations that (i) "Defendant provided money directly to Hizbollah to carry out the attacks," (ii) any funds provided by LCB

---

[16] Plaintiffs' attempt (FAC ¶¶112-117) to satisfy their pleading obligations by attributing "anti-Israel sentiment" and support for "using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants" to "Lebanese society" at large, including its banks, and repeating, without factual support, their claim that LCB harbored similar intentions as a matter of its "policy," is conclusory and entirely insufficient under *Iqbal* and its progeny.

were sent to Hezbollah and used to perpetrate the attacks, or (iii) "Hizbollah would not have been able to carry out the attacks absent those specific funds." *Id*. at 533.

Likewise, in *O'Sullivan*, Judge Swain dismissed ATA primary liability claims on proximate cause grounds finding that:

> The Complaint proffers no non-conclusory allegation that the funds processed by Defendants for various Iranian entities were in fact transferred to [various alleged terror groups], nor does it allege facts sufficient to support plausibly the inference that Iran and its Agents and Proxies would have been unable to assist [those terror groups] in carrying out the attacks without Defendants' assistance.

*O'Sullivan*, 2019 WL 1409446, at *5; *see also Fields v. Twitter, Inc.*, 881 F.3d 739, 749-50 (9th Cir. 2019) (dismissing ATA claims because "facilitat[ing] the organization's growth and ability to plan and execute terrorist acts" was not sufficient to establish proximate cause in the absence of any "connection between [Defendant's] provision of this aid and [Plaintiffs'] injuries").

Nor can Plaintiffs show that the banking services allegedly provided to the Five Customers were a "substantial factor" in causing the rocket attacks.   *See Kaplan*, 405 F. Supp. 3d. at 533 (finding the causal link between LCB's provision of financial services and Plaintiffs' injuries too attenuated); *Freeman*, 2019 WL 4452364, at *18 ("[T]he provision of financial services to Iran or various Iranian entities is insufficient on its own to support a plausible inference that the transactions facilitated by Defendants proximately caused the IED explosions in Iraq that injured Plaintiffs."); *O'Sullivan*, 2019 WL 1409446, at *6 ("Iran's role as both an intermediary and a state sponsor of terrorism simply 'does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or organization.'") (citation omitted).   The FAC allegations are utterly lacking in this regard.

In addition to alleging a direct and substantial link between LCB's conduct and the conduct that resulted in their injuries, Plaintiffs must allege that their "injur[ies] w[ere] reasonably foreseeable or anticipated as a natural consequence" of LCB's conduct to establish proximate

cause. *Rothstein*, 708 F.3d at 91; *accord O'Sullivan*, 2019 WL 1409446, at *5; *Ahmad v. Christian Friends of Israeli Cmtys.*, 2014 WL 1796322, at *4 (U.S. Dist. Ct., S.D.N.Y. May 5, 2014). The allegations here are insufficient, however, to establish that LCB knew – at the time it provided routine banking services to persons and entities– that its conduct could lead to the rocket attacks. Moreover, as the Second Circuit held in *Rothstein*, allegations that a defendant bank's banking services merely "made it more likely that the moneys would be used for terrorism" are not enough. 708 F.3d at 96-97.[17]

### 3. Plaintiffs fail to allege facts plausibly showing LCB has secondary (conspiracy or aiding and abetting) liability under the ATA

The FAC additionally fails to state a secondary liability claim under JASTA, which requires: (1) Plaintiffs' claims must arise from an act of "international terrorism" (as defined in § 2331(1)) that was "committed, planned, or authorized" by a then-designated FTO; and (2) LCB must have "knowingly provid[ed] substantial assistance" to, or "conspire[d] with," "*the person who committed*" the act of "international terrorism" that injured Plaintiffs. 18 U.S.C. § 2333(d)(2) (emphasis supplied).

As a threshold matter, none of the Five Customers is alleged to be the "the person who committed" an act of "international terrorism" that caused Plaintiffs' injuries. That alone should doom Plaintiffs' JASTA claims. But even if it does not, Plaintiffs have failed to allege facts plausibly showing the elements of conspiracy or aiding and abetting liability have been met.

---

[17] The primary liability claims must be dismissed for the independent reason that the FAC fails to allege that LCB committed a criminal act, which requires facts plausibly satisfying the *mens rea* element of the relevant criminal statute. *See* 18 U.S.C. § 2331(1)(A). Here, to violate material support provisions, FAC ¶133, LCB's conduct must be "knowing" and, as above, providing banking services to customers other than Hezbollah does not satisfy this standard.

### a. The FAC fails to allege the *Halberstam* elements of conspiracy

In assessing the sufficiency of Plaintiffs' allegations to state a secondary liability claim under §2333(d)(2), this Court has been directed to follow the "legal framework" set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Linde*, 882 F.3d at 329.   Under that framework, the elements of a conspiracy include:

> "(1) [A]n agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."

*Halberstam*, 705 F.2d at 477 (citation omitted).   "The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct."  *Id*. at 478.

Here, the FAC makes no real attempt to plead the elements of a conspiracy.  The closest the FAC comes is the conclusory allegation that LCB engaged in an "extensive, long-term criminal scheme" and "in furtherance of that common plan, Hizbollah fired the rockets."   FAC ¶151. Conspicuous by its absence is any mention of the words, "agreed," "agreement," or "conspired," there, or in the remainder of the FAC.  As Judge Daniels succinctly observed in *Kaplan*, "fatal to Plaintiffs' claim for conspiracy liability is their failure to sufficiently allege any unlawful agreement between Defendant and Hizbollah."  405 F. Supp. 3d. at 534.

And even if the FAC adequately alleged an agreement (which it does not), it does not allege that it was an agreement to commit acts of international terrorism. 18 U.S.C. § 2333(d)(2); *see also O'Sullivan*, 2019 WL 1409446, at *9 ("[T]o be subject to secondary liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international

terrorism.").  As in *Kaplan*, there are no *non-conclusory* allegations in the FAC that "would lead one to infer that [LCB] shared any common goal of committing an act of international terrorism." 405 F. Supp. 3d at 534; *see also O'Sullivan*, 2019 WL 1409446, at *9.  To the contrary, the SAC alleges only that LCB provided financial services to the Five Customers, FAC ¶¶35-58, and, even assuming an agreement with its customers, as opposed to Hezbollah were sufficient, the FAC provides no facts to support a reasonable inference that LCB and the Five Customers made any agreement to engage in "international terrorism," or on any subject other than what may be inferred from a typical arms-length customer relationship.

### b.  The FAC fails to allege the *Halberstam* elements of aiding-and-abetting

To state an aiding-and-abetting claim, JASTA also requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477).  JASTA further requires that "the defendant must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).  The FAC fails to plead either of these elements.

Here, Plaintiffs do little more than allege in generalized and conclusory fashion that LCB knew or should have known about the connection between Hezbollah and the Five Customers because these customers were "integral constituent parts" and leaders of Hezbollah.  FAC ¶30, 95-98.  As recent decisions make clear, however, the mere provision of services to an FTO – even material support to an FTO – is not sufficient to satisfy JASTA's knowledge requirement.  *Linde*, 882 F.3d at 32 ("[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization.") (emphasis in original); *see also Weiss v. Nat'l Westminster Bank PLC,* 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019) ("evidence

that [a] Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement").

In *Kaplan*, for example, Judge Daniels (correctly) found such general awareness allegations insufficient because "[e]ven assuming, *arguendo*, that Defendant knew or should have known prior to the attacks about the Five Customers' relationships with Hizbollah, failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities." 405 F. Supp. 3d. at 535. Judge Daniels thus concluded that by providing routine financial services to its customers, LCB cannot be said to have been "aware" it was playing a "role" in terrorist activity, let alone be said to have "substantially assist[ed] the principal violation." *Id.*; *see also Linde*, 882 F.3d at 329-31; *Halberstam*, 705 F.2d at 477. Plaintiffs' failure to plausibly allege that LCB knew of its supposed role in terrorist activities therefore dooms the aiding-and-abetting claim.

The FAC fails to allege facts plausibly showing LCB's conduct constituted substantial assistance required by JASTA. In deciding "whether a defendant's assistance is 'substantial enough' to constitute aiding-and-abetting," courts consider "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 330 (citing *Halberstam*, 705 F.2d at 483-84).

These substantiality factors each favor dismissal: (1) the "nature of the act encouraged" – there is no allegation that any specific transaction "might matter, i.e., be substantial" to carrying out the rocket attacks; (2) "the amount of assistance" – there is not a single nonconclusory allegation that LCB offered services of *any* kind directly to Hezbollah, or the individuals who carried out the rocket attacks, much less that any such services were a "major part" of, or "integral"

to, instigating the attacks; (3) the defendant's "presen[ce] at the time" of the tort – there is no allegation that LCB was present at the time of the rocket attacks; (4) defendant's relation to the principal – there are no allegation of any relationship at all between LCB and the individuals who carried out the attack; (5) the defendant's "state of mind" – there are no factual allegations to plausibly infer that LCB knew that any of its alleged banking services were intended to facilitate the attacks; and (6) the "duration of the assistance" – while there are allegations of banking services provided, there is no link to the attacks themselves. *Halberstam*, 705 F.2d at 483-84, 488; *see also Kaplan*, 405 F. Supp. 3d. at 536 ("although Plaintiffs assert that Defendants processed millions of dollars' worth of wire transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds."); *Siegel v. HSBC N.A. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) (affirming dismissal of JASTA aiding and abetting claims for failure to plead substantial assistance, because the plaintiffs had not "plausibly alleged that [defendant] encouraged the heinous November 9 Attacks or provided any funds to [the terrorist group].").

The FAC consequently fails to plead facts plausibly showing substantial assistance and the aiding-and-abetting claim therefore must be dismissed.

### Conclusion

The FAC against SGBL should be dismissed in its entirety with prejudice.

Respectfully submitted,

February 7, 2020                              **ASHCROFT LAW FIRM, LLC**

By:    /s/ Michael J. Sullivan
       Michael J. Sullivan
       Brian J. Leske
       Ashcroft Law Firm, LLC
       200 State Street, 7th Floor

- 50 -

Boston, MA 02109
617-573-9400

Email: msullivan@ashcroftlawfirm.com
Email: bleske@ashcroftlawfirm.com

*Counsel for Defendant Société Générale de Banque au Liban S.A.L.*