**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

ESTER LELCHOOK, *et al.*,

                          Plaintiffs,

              -against-

SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL,

                     Defendant.

-------------------------------------------------------------------- X

Case No.
1:19-cv-00033

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS**

THE BERKMAN LAW OFFICE, LLC

*Attorneys for the Plaintiffs*
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

## INTRODUCTION

From July 12 until August 14, 2006, the Hizbollah terrorist organization fired thousands of rockets and missiles at civilian population centers in Israel (hereinafter: "Hizbollah Rocket Attacks"). One of these Hizbollah rockets struck and killed David Martin Lelchook, an American citizen, while he was riding a bicycle on a kibbutz in northern Israel, on August 2, 2006. Many other U.S. citizens were physically injured or otherwise harmed by the Hizbollah Rocket Attacks.

The plaintiffs in this action are the estate and family members of decedent David Martin Lelchook, and 21 other American citizens who were harmed as a result of the Hizbollah Rocket Attacks. The details of the attacks in which David Martin Lelchook was killed and the other plaintiffs were injured, and the nature of those injuries, are set forth in paragraphs 59-80 of plaintiffs' First Amended Complaint ("FAC") in this action. (DE 73).

Hizbollah did not act alone. In order to recruit, obtain and deploy the extensive human and material assets needed to build, maintain and operate its massive rocket and missile arsenal in the years leading up to the summer of 2006, Hizbollah needed partners and supporters. One of Hizbollah's key partners and supporters in this effort was Lebanese Canadian Bank, SAL ("LCB").

LCB was a rogue bank. As explained in the FAC (and as is confirmed, *inter alia*, by a verified forfeiture complaint filed against LCB by the United States, and by findings against LCB made by the U.S. Treasury), LCB knowingly provided many millions of dollars in wire transfer and other banking services to Hizbollah over a period of many years, beginning in 2002 or earlier. The banking services provided by LCB to Hizbollah were a unique commodity: Hizbollah is subject to a strict U.S. sanctions regime which bars the provision of such services on pain of crushing penalties. But for LCB's willingness to violate U.S. law to provide those services – *i.e.*, effectively to "martyr" itself economically for the Hizbollah cause – Hizbollah would have been

unable to obtain them elsewhere. And LCB's services enabled Hizbollah to carry out the Rocket Attacks in which decedent David Martin Lelchook was murdered and the other plaintiffs harmed. (*See* FAC ¶¶ 30-55; 81-90).

LCB's role as Hizbollah's eager banker eventually caught up with it, as was inevitable. In 2008, a civil suit was filed against LCB in New York State court (later removed to the SDNY) by American, Israeli and Canadian civilians (including some of the plaintiffs here) who were injured, and/or whose family members were killed, by the Hizbollah Rocket Attacks. Then, in February 2011, the U.S. Treasury designated LCB as "a financial institution of primary money laundering concern," due to its extensive involvement with and support for Hizbollah.

On June 22, 2011, the defendant, Société Générale De Banque Au Liban SAL ("SGBL"), entered into an Sale and Purchase Agreement with LCB, under which SGBL purchased all of LCB's assets and assumed ***all*** of LCB's "liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to [LCB's] Business." (*See* FAC ¶ 12; 121-126; FAC Exhibit 1, *passim*).

Given the unlimited scope of this language, and the fact that SGBL agreed to this sweeping provision assuming ***all*** of LCB's liabilities knowing full well that the U.S. Treasury had confirmed LCB's relationship with Hizbollah and that LCB had ***already*** been sued by victims of the Hizbollah Rocket Attacks, there can be no doubt whatsoever that SGBL knowingly assumed LCB's liabilities to the victims of those Attacks – such as the plaintiffs herein. Thus, while SGBL may be entitled to dispute the *merits* of whether LCB's conduct gives rise to liability for the Hizbollah Rocket Attacks, it cannot in good faith dispute that it assumed all such liability.

Accordingly, the plaintiffs filed this action, asserting successor liability against SGBL for LCB's conduct, pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333.[1]

Now, seeking to continue to enjoy all the benefits of its bargain with LCB while shirking its assumption of LCB's liabilities to the victims of the Hizbollah Rocket Attacks, SGBL has moved to dismiss the FAC for lack of personal jurisdiction and for failure to state a claim.

For the reasons set forth below SGBL's motion should be denied, and this matter should proceed to discovery and trial. Alternatively, *i.e.*, if the Court finds that personal jurisdiction cannot be determined on this motion, it should order jurisdictional discovery.[2]

## **BACKGROUND**

### a.  **Hizbollah and LCB**

Hizbollah has been designated by the United States as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001. And for good reason: between its founding in 1982 and the summer of 2006 (and until the present day), Hizbollah carried out hundreds of terrorist attacks against American targets in which hundreds of

---

[1] It is well established that "a successor liability claim can be pursued in a separate suit, *see, e.g., AW Indus., Inc. v. Sleepingwell Mattress Inc.,* No. 10-CV-4439, 2011 WL 4404029, at \*5 (E.D.N.Y. Aug. 31, 2011) ("Although a separate corporate entity, [the defendant] could be held liable for [another entity's] acts or judgments as an alter ego, mere continuation, or liable successor of [that entity], and [the] plaintiff is free to initiate a separate action to that effect.")." *Lin v. Toyo Food, Inc.*, 2016 WL 4502040, at \*3 (S.D.N.Y. Aug. 26, 2016). *See also e.g. Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., Inc*., 2009 WL 10687800, at \*6 (D. Conn. Nov. 19, 2009) (same).

Thus, there is no basis whatsoever for SGBL's claims that the plaintiffs were required to sue SGBL together with LCB. To the contrary, plaintiffs were "free to initiate a separate action" against SGBL. *Id*.

[2] As discussed below, the Court cannot address SGBL's non-jurisdictional arguments for dismissal (including its preclusion claim), unless and until jurisdiction is established.

-3-

U.S. citizens were killed and hundreds more wounded. (*See* FAC ¶ 17-29). In fact, "Hezbollah has killed more Americans than any other terrorist group with the exception of al-Qaeda." [3]

Because Hezbollah is a designated FTO, it is subject to strict economic sanctions programs imposed by the U.S. Government ("U.S. Sanctions Regime"), intended to prevent Hezbollah from accessing the international financial system and reduce its ability to perpetrate terrorist attacks. (FAC ¶¶ 35-42). LCB, however, intentionally violated the U.S. Sanctions Regime.

Specifically, as detailed in the FAC, and in the Verified Amended Complaint ("VAC") in *U.S. v. Lebanese Canadian Bank*, 11-cv-9186 (S.D.N.Y.) (which was incorporated by reference into the FAC and is attached hereto as **Exhibit A**[4]), between 2003 and 2006, LCB knowingly provided extensive financial services to Hezbollah by, *inter alia*, holding accounts and conducting transfers and deposits totaling many millions of dollars for Hezbollah entities which comprise part of Hezbollah itself, and for some of Hezbollah's most senior officials.

Hizbollah is a composite, umbrella organization. It includes multiple subordinate entities that carry out specific tasks. Whether or not they have putative separate legal personalities, these subordinate entities are integral parts of Hizbollah *itself*. (FAC ¶ 30). Thus, as a Congressional Research Service Report explained, "Lebanon's Hezbollah ('Party of God') is a Shiite Islamist militia, political party, social welfare organization, and U.S. State Department-designated terrorist

---

[3] H. Res. 923, "Condemning the recent attacks against the State of Israel," Jul. 18, 2006, 109th Cong. (2006).

[4] Materials incorporated by reference into the FAC are properly considered on a Rule 12(b)(6) motion. *In re JPMorgan Chase & Co. Sec. Litig.*, 2014 WL 1297446, at *4 (S.D.N.Y. Mar. 31, 2014) ("Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (quotations and citation omitted).

organization … ***Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements***."[5] (FAC ¶ 30).

One of Hizbollah's most important components is the Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization) ("Shahid").[6] Shahid is part of Hizbollah's Social Service Section, which a senior U.S. military analyst has correctly characterized as the "most important branch of the Hezbollah organization… ***The Social Service Section serves as an equal arm within the organization*** and is used as much as the military and political wing in terms of leverage."[7] Shahid's purpose is to provide financial and other material support to Hizbollah terrorists wounded in action, and to the families of Hizbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to current and prospective" Hizbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[8] (FAC ¶ 31-32).

Two other important components of Hizbollah, during the years prior to and through 2006, were Bayt al-Mal and the Yousser Company for Finance and Investment ("Yousser"). In a statement issued on September 7, 2006, the U.S. Treasury explained that:

> Bayt al-Mal is a Hizballah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hizballah Secretary General Hasan Nasrallah. As ***Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hizballah***. …

---

[5] Casey L. Addis and Christopher M. Blanchard, **Hezbollah: Background and Issues for Congress** (January 3, 2011), at 1, 10 (emphasis added).

[6] The name "Shahid," which is Arabic for "martyr," is sometimes spelled "Shaheed."

[7] Major James B. Love, **Hezbollah: Social Services as a Source of Power**, U.S. Joint Special Operations University (2010), at 21 (emphasis added).

[8] *Id*. at 24.

> Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hizballah companies.[9]

(FAC ¶ 33).

Similarly, Stuart Levey, the U.S. Treasury's Under Secretary for Terrorism and Financial Intelligence, expressly confirmed that, "Bayt al-Mal and the Yousser Company function *as Hizballah's unofficial treasury*, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks."[10] (FAC ¶ 34).

Between 2004 (or earlier) and July 2006 (and later), LCB maintained numerous accounts for Shahid, Bayt al-Mal and Yousser, and for senior Hezbollah officials Husayn al-Shami and Wahid Mahmoud Sbeity (collectively, the "Five Customers") through which LCB transferred **many millions of dollars** to Hizbollah. (*See* FAC ¶¶ 47-55; 101). The FAC provides the details of those accounts, including account numbers and the specific LCB branches involved. (*Id*.).

Husayn Al-Shami was the head of Bayt al-Mal and a notorious Hezbollah leader who served as a member of Hezbollah's seven-member politburo (known as the Shura Council) and as the head of several Hezbollah-controlled organizations. (*See* FAC ¶ 100 (citing Treasury designations of Bayt al-Mal, Yousser, and Husayn al-Shami); VAC (Exhibit A), ¶ 47(a). And Sbeity was an owner of Yousser. (*See* VAC (Exhibit A) ¶ 47(g)(3)).

For years prior to July 12, 2006, Hezbollah openly, publicly, and repeatedly acknowledged on its official websites, in official press releases it issued, on its official television station, on its official radio station, and in numerous press conferences and news media interviews conducted by its senior officials that Shahid, Bayt al-Mal and Yousser were integral constituent parts of

---

[9] **Treasury Designation Targets Hizballah's Bank**, at https://www.treasury.gov/press-center/press-releases/Pages/hp83.aspx (emphasis added).

[10] *Id.* (emphasis added).

Hezbollah. (FAC ¶¶ 96-98). Additionally, Shahid's role as an integral part of Hezbollah was publicized for many years prior to July 12, 2006 in a myriad of sources, including newspapers published and distributed in Lebanon and in Europe, and multiple BBC publications. *Id.*

Not only did Shahid, Bayt al-Mal and Yousser openly identify as components of Hezbollah throughout the relevant period, but LCB assisted them to conduct their financial operations in a deceptive and sub rosa manner. For example, as early as 2003, LCB granted each of them special exemptions from submitting cash transaction slips ("CTSs") for reporting cash transactions over $10,000 as required by Lebanon's Central Bank. (FAC ¶ 101). Specifically, LCB bank officials granted Yousser an exemption from reporting $50,000 in cash per week at one LCB branch and up to $60,000 *per day* at another. (VAC (Exhibit A), ¶ 47(g)(1)). LCB also exempted Shahid from reporting cash transactions up to *$100,000 per day*. (*Id.*, ¶ 47(g)(7)). Hizbollah leaders Husayn al-Shami and Wahid Mahmoud Sbeity were exempted from reporting up to $30,000 in cash transactions per week at one LCB branch, and al-Shami was exempted from reporting up to *$200,000 in cash transactions per day* at another branch. (*Id.*, ¶ 47(g)(3)).

By actively assisting Hizbollah's leaders and subordinate entities, including Shahid, Yousser and Bayt al-Mal, to conduct cash banking activities designed to ***evade reporting requirements, in order to avoid scrutiny or interference by Lebanese government authorities***, LCB powerfully evidenced ***its own consciousness of guilt***.

Even after Yousser and al-Shami were designated SDGTs on September 7, 2006 (Yousser because of its role as "Hezbollah's unofficial treasury" and al-Shami because of his senior leadership role in Hizbollah and his position as head of Bayt al-Mal), LCB continued to maintain banking relationships with them, despite the serious risks to LCB itself. (*See* FAC ¶¶ 116(b); VAC (Exhibit A), ¶ 47(a); ¶ 47(h)). LCB's continued support for Hizbollah in the face of grave legal

peril to LCB from the United States government, shows clearly that LCB provided assistance to Hizbollah as a matter of a considered, ideologically-motivated policy.

LCB did not bother to hide its ideological support for Hizbollah and its anti-Israel program. In response to a 2002 UN report about a Hizbollah-linked money laundering gang with which LCB had a banking relationship, LCB stated that "**we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon**" and not only refused to end the relationship, but authorized an increase in credit limits for the Hizbollah gang. (FAC ¶ 116(a); VAC (Exhibit A), ¶ 47(f)).

Furthermore, in its published designation of LCB as a "primary money laundering concern" due to its extensive involvement with and support for Hizbollah (76 Fed. Reg. 9403, Feb. 17, 2011), which was incorporated into the FAC by reference, the U.S. Treasury confirmed that LCB's "General Manager, his deputy, and the managers of key branches are in frequent—in some cases even daily—communication with various members of the [Hizballah] network, and they personally process transactions on the network's behalf. Additionally, LCB managers are linked to Hizballah officials outside Lebanon. For example, Hizballah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services." (FAC ¶ 116(c)).

The extensive banking and other financial services knowingly and intentionally provided by LCB to Hizbollah enabled Hizbollah to build, maintain and operate the human and logistical infrastructure it required to fire thousands of rockets into northern Israel between July 12, 2006 and August 14, 2006. (FAC ¶¶ 81-89).

**b.**   **The Licci/Kaplan Action Against LCB**

In 2008, eighteen of the plaintiffs herein (the "Kaplan Plaintiffs"[11]), along with several score Israeli and Canadian citizens who had been injured, or whose family members had been killed, in the Hizbollah Rocket Attacks, filed suit against LCB and its New York correspondent bank, American Express Bank ("Amex Bank"), in New York County Supreme Court, asserting non-federal claims under Israeli law. *Licci, et al. v. American Express Bank Ltd., et al.*, Index No. 109548/08. Amex Bank then removed the action to the SDNY. *Licci, et al. v. American Express Bank Ltd., et al.*, No. 08-cv-7253-GBD (S.D.N.Y.).

After removal, the plaintiffs filed a First Amended Complaint, asserting claims against LCB under the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq.*, ("ATA") on behalf of the Kaplan Plaintiffs, claims against LCB under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") on behalf of the foreign-national plaintiffs, and various non-federal causes of action on behalf of all plaintiffs against both LCB and Amex Bank. (*Licci*, No. 08-cv-7253, DE 23).

Both LCB and Amex Bank moved to dismiss for failure to state a claim, and LCB also contested personal jurisdiction. On March 31, 2010, the District Court (Daniels, J.) dismissed the *Licci* action against Amex Bank for failure to state a claim, and dismissed the action against LCB for lack of personal jurisdiction, finding that LCB's use of a New York correspondent bank account to provide the wire transfer services at issue were too attenuated from the rocket attacks to assert

---

[11] The Kaplan Plaintiffs were: Chaim Kaplan; Rivka Kaplan; Brian Erdstein; Karene Erdstein; Ma'ayan Erdstein; Chayim Kumer; Nechama Kumer; Laurie Rappepport; Margalit Rappeport; Theodore (Ted) Greenberg; Moreen Greenberg; Jared Sauter; Dvora Chana Kaszemacher; Chaya Kaszemacher Alkareif; Avishai Reuvane; Elisheva Aron, Yair Mor; and Mikimi Steinberg.

The plaintiffs in this action who were not plaintiffs in the *Licci* action (referred to hereinafter as the "New Plaintiffs") are: Ester Lelchook (individually and as personal representative of the estate of David Martin Lelchook); Michal Lelchook; Yael Lelchook; Alexander Lelchook (individually and as personal representative of the estate of Doris Lelchook); Malka Kumer; Chana Liba Kumer; and Miriam Almackies.

personal jurisdiction. *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010) ("*Licci I*"). On appeal, the Second Circuit affirmed the dismissal of the claims against Amex Bank. *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155 (2d Cir. 2012).

However, in a separate opinion addressing the dismissal of LCB for lack of personal jurisdiction, the Second Circuit certified the jurisdictional question to the New York Court of Appeals. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*"). The New York Court of Appeals found that the New York long arm statute, N.Y. C.P.L.R. § 302(a)(1), reached LCB due to its purposeful availment of New York correspondent accounts to process transfers on behalf of Hezbollah. *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012) ("*Licci III*"). The Second Circuit then independently found that personal jurisdiction over LCB comported with due process protections. *Licci v. Lebanese Canadian Bank*, *SAL*, 732 F.3d 161, 165 (2d Cir. 2013) ("*Licci IV*").

Noting that its remand of the action against LCB would revive its motion to dismiss for failure to state a claim, the Second Circuit instructed the District Court to address how the intervening decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), affected the its subject matter jurisdiction over the *Licci* plaintiffs' ATS claims. *Licci IV*, 732 F.3d at 174. In *Kiobel*, the Supreme Court held that "the presumption against extraterritoriality applies to claims under the ATS." 569 U.S. at 124. Even where the claims asserted "touch and concern the territory of the United States," the Supreme Court found that "they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124-25.

On remand, the District Court held that the *Licci* plaintiffs had sufficiently alleged that LCB's conduct "touched and concerned" the U.S. with sufficient force to displace the presumption against extraterritoriality but found that their allegations had failed to meet the required *mens rea*

-10-

for secondary liability, and therefore dismissed the ATS claims. *Licci v. Lebanese Canadian Bank*, *SAL*, 2015 WL 13649462, at *4-5 (S.D.N.Y. April 14, 2015) ("*Licci V*").

On appeal, the Second Circuit rejected much of the *Licci V* analysis, finding that the plaintiffs had sufficiently pleaded that LCB had aided and abetted the Hizbollah Rocket Attacks, even under the heightened *mens rea* standard for aiding and abetting under the ATS, which – unlike the ATA – requires "purpose rather than knowledge alone." *Licci v. Lebanese Canadian Bank*, *SAL*, 834 F.3d 201, 212-19 (2d Cir. 2016) ("*Licci VI*") (citations omitted).

In determining that the plaintiffs had sufficiently pleaded a claim for aiding and abetting under the ATS, the Second Circuit noted that "[t]he U.S. government has taken two actions that reinforce many of Plaintiffs' allegations against LCB.  First … the U.S. government initiated a civil forfeiture action against LCB properties … Second … the U.S. Department of Treasury … has designated LCB as 'a financial institution of primary money laundering concern.'" *Licci VI*, at 208-209.[12] The Second Circuit also credited "an expert declaration from former Israeli intelligence officer Uzi Shaya" which plaintiffs had submitted to the District Court. *Id.* at 207.[13] The Second Circuit then proceeded to analyze whether the allegations of plaintiffs' complaint, as bolstered by the factual information contained in the Government's forfeiture complaint, the Treasury Designation, and the Shaya Declaration, stated a claim for aiding and abetting under the ATS.[14]

---

[12] As discussed above, the VAC was incorporated by reference into the FAC, and is attached hereto as Exhibit A. The Treasury Designation is cited and relied upon in the FAC (and is published in the Federal Register. *See* 76 Fed. Reg. 9403, Feb. 17, 2011. A copy is attached hereto as Exhibit B.

[13] The Shaya Declaration was docketed in *Licci*, 08-cv-7253 as DE 43. A copy is attached here to as Exhibit C.

[14] The VAC, the Treasury Designation and the Shaya Declaration are subject to consideration by this Court in disposing of SGBL's Rule 12(b)(6) motion. The VAC and the Treasury Designation are public records subject to judicial notice and were incorporated into and relied upon in the FAC. The Shaya Declaration is part of the record in *Licci*,  and therefore also properly considered on a Rule 12(b)(6) motion.

The Second Circuit Court found that plaintiffs had stated a valid ATS aiding and abetting claim, based on the allegations and findings below:

- "LCB used its correspondent banking account in New York to facilitate dozens of international wire transfers for the Shahid, an entity alleged to be an 'integral part' of Hezbollah."

- "LCB 'provided extensive banking services to [Hezbollah]' that 'caused, enabled[,] and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed' … Plaintiffs further allege that 'between 2004 and July 12, 2006 (and subsequently), [Hezbollah] made and received dozens of dollar wire transfers ... totaling several million dollars,' and that '[a]ll' of those wire transfers 'were made to, from, and/or between' Hezbollah's bank accounts at various LCB branches."

- "Plaintiffs adequately allege that these wire transfer services had a substantial effect on Hezbollah's actions insofar as they 'enabled' and 'facilitated' terrorist rocket attacks harming or killing Plaintiffs and their decedents. Plaintiffs further allege that LCB's wire transfers 'substantially increased and facilitated [Hezbollah's] ability to plan, to prepare for[,] and to carry out rocket attacks on civilians,' including the rocket attacks injuring or killing Plaintiffs and their family members. In addition, Plaintiffs particularly allege that '[Hezbollah] planned, made the preparations necessary for and

_____

*D.P. Tech. Corp. v. Sherwood Tool*, 751 F. Supp. 1038, 1039 (D. Conn. 1990) ("matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice on Rule 12(b)(6) motion of public documents filed with SEC).

Additionally, of course, since the factual information contained in those three documents was incorporated into findings contained in the opinion of the Second Circuit, the facts and findings contained in that opinion also can and should be considered by the Court in disposing of the Rule 12(b)(6) motion.

carried out' the rocket attacks by 'utilizing funds' received as part of the wire transfers. Plaintiffs' allegations are bolstered by evidence in the record that LCB's wire transfers 'significantly enhanced [Hezbollah]'s ability to plan and carry out terrorist and other violent actions, including the rocket attacks in which [Plaintiffs] were harmed.'"

- "Plaintiffs allege that (1) LCB acted intentionally, and pursuant to its official policy, in assisting Hezbollah in carrying out the rocket attacks by carrying out the wire transfers, and (2) LCB knew that the bank accounts between which it facilitated transfers were owned and controlled by Shahid, an integral part of Hezbollah."

- "Plaintiffs allege that 'as a matter of official LCB policy' LCB 'continuously supports and supported [Hezbollah] and its anti-Israel program, goals[,] and activities.' They also allege that LCB had 'actual knowledge' that (1) '[Hezbollah] is a violent terrorist organization [that] carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks,'; (2) 'Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm,'; (3) Hezbollah's bank accounts at various LCB branches and the funds therein 'were owned and controlled by [Hezbollah],'; (4) the wire transfers made and received by Hezbollah leading up to the 2006 rocket attacks 'were being carried out by and at the direction of [Hezbollah],'; and (5) Hezbollah 'require[d] wire transfer services ... in order to plan, to prepare for and to carry out terrorist attacks.' Plaintiffs then allege that LCB, equipped with this actual knowledge, carried out the wire transfers at issue 'with the specific purpose and intention of enabling and assisting [Hezbollah] to carry out terrorist attacks against Jewish civilians in Israel.' Indeed, the complaint states that LCB carried out the wire transfers 'as a matter of official LCB

-13-

policy, in order to assist and advance [Hezbollah's] terrorist activities against Jews in Israel, in order to assist and advance [Hezbollah's] goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance [Hezbollah's] goal of coercing, intimidating and influencing the Israeli government and public.'"

- "[T]he Shaya declaration states that between '2004 and July 12, 2006 (and later),' Hezbollah 'made dozens of dollar wire transfers in and out of' a specific account number at LCB's headquarters. Shaya stated that LCB requested that its correspondent bank in New York carry out the wire transfers and identified Shahid as the account-holder."

- "In addition, the government forfeiture action against LCB lends support to Plaintiffs' allegations. Specifically, the government alleged that LCB engaged in activity 'intended to conceal and disguise the true source, nature, ownership, and control of' proceeds of illegal activities in a scheme that 'benefitted [Hezbollah].'"

*Licci*, 834 F.3d at 215-219 (citations to the appellate record omitted).

However, the Second Circuit was ultimately constrained to dismiss the ATS claims under circuit precedent holding that corporations cannot be held liable under the ATS. *Id.* at 219-20.

In the same opinion in which it dismissed the *Licci* plaintiffs' ATS claims, the District Court also concluded that their ATA claims were precluded by *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013), which had held that the Hizbollah Rocket Attacks constituted an "act of war" and were therefore not actionable under the ATA pursuant to 18 U.S.C. § 2336(a). *Licci V*, 2015 WL 13649462, at *3, *aff'd*, 659 F. App'x 13 (2d Cir. 2016).

-14-

The D.C. Circuit later reversed *Kaplan* in 896 F.3d 501 (D.C. Cir. 2018), and Congress subsequently eliminated the act of war exception for attacks carried out by FTOs. *See* Antiterrorism Clarification Act of 2018, Pub. L. 115-253, § 2, 132 Stat. 3183 (Oct. 3, 2018).

Accordingly, the Kaplan Plaintiffs moved to vacate the earlier "act of war" dismissal of their ATA claims against LCB. In October 2018 the District Court granted the motion for vacatur and reinstated the Kaplan Plaintiffs' ATA claims against LCB. *Licci v. Lebanese Canadian Bank, SAL*, 2018 WL 5090972 (S.D.N.Y. Oct. 3, 2018). Following reinstatement of their ATA claims against LCB, the Kaplan Plaintiffs filed a Second Amended Complaint ("SAC"), asserting primary and secondary liability claims against LCB under ATA §§ 2333(a) and 2333(d).

On September 20, 2019, the District Court granted LCB's motion to dismiss the Kaplan Plaintiffs' SAC for failure to state a claim. *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525 (S.D.N.Y. 2019). The Kaplan Plaintiffs timely appealed that dismissal to the Second Circuit. *Licci v. American Express Bank*, No. 19-3522 (2nd Cir.). The Kaplan Plaintiffs' appellate brief has already been filed, and LCB's brief is due on June 22, 2020. (*Id.* at DE 77).

### c. **SGBL Assumes LCB's Liability to Victims of the Hizbollah Rocket Attacks**

On June 22, 2011, defendant SGBL entered into a Sale and Purchase Agreement ("Purchase Agreement") with LCB. Pursuant to paragraphs 2.1, 2.2 and 2.3 of the Purchase Agreement, a copy of which was attached as **Exhibit 1** and incorporated into the FAC, SGBL purchased all of LCB's assets, and assumed all of LCB's liabilities.

Thus, Paragraph 2.1 of the Purchase Agreement expressly provides that LCB "shall transfer, convey, and assign … to [SGBL], and [SGBL] shall receive and assume from [LCB], ***all of [LCB]'s Assets and Liabilities***." (Emphasis added). Paragraph 2.2 of the Purchase Agreement

makes clear that the term "all" used in Paragraph 2.1 does indeed mean, literally, "all," clarifying that SGBL was purchasing LCB's entire business and all its assets, including, "*inter alia*":

> any and all rights, titles and interests of [LCB] in and to the Properties, assets, and rights of every nature, kind and description, tangible and intangible whether real, personal or mixed, whether accrued or unaccrued, absolute or contingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise as at the Completion Date, to the extent they relate to [LCB]'s Business, including without limitation: Advances, Commitments, Assumed Contracts, Disclosure Documents, Securities, Leases, Owned Properties, IT System, Equipment, Supplier Contracts, Books, good will, shares held by [LCB] in its Subsidiaries, profits for the fiscal years 2010 and 2011 and all rights in connection with the Business, all as at the Completion Date.

FAC**, Exhibit 1** at Paragraph 2.2.

Clearly, then, SGBL bought out LCB lock, stock and barrel. Moreover, after acquiring all of LCB's assets, SGBL continued LCB's business operations effectively unchanged, from the same locations and using the same personnel – but under the SGBL name. For example, in a press release issued on September 9, 2011, SGBL announced that: "As of today, **all of the 35 branches that were acquired [from LCB] will become under SGBL's signage and will therefore display the brand's colors and corporate identity.**" (FAC ¶ 125, emphasis added) And in an interview with Lebanon's LBC TV on March 3, 2011, the governor of Lebanon's Central Bank Riad Salameh stated that SGBL had "pledged to **keep all LCB employees**." (*Id*., emphasis added).

Like its purchase of LCB's assets, SGBL's assumption of LCB's liabilities under the Purchase Agreement was sweeping and all inclusive, encompassing "*inter alia*":

> any and all of [LCB]'s liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to [LCB]'s Business, all as at the Completion Date.

FAC, **Exhibit 1** at Paragraph 2.3.

Notably, at the time SGBL assumed all of LCB's liabilities, on June 22, 2011, the *Licci* action was still pending on appeal. Moreover, during oral argument before the Second Circuit on February 25, 2011, members of the panel indicated that they were considering certifying the personal jurisdiction question to the New York Court of Appeals – which of course they later did. Thus, when it assumed all of LCB's liabilities, SGBL knew full well both that (i) those liabilities included LCB's tort liability to the *Licci* plaintiffs (including most of the instant plaintiffs) and other, similarly-situated victims of Hizbollah terrorism, and (ii) LCB – and thus SGBL – might be subject to suit in New York or other U.S. courts in actions brought by such plaintiffs.

Before SGBL stripped it of its assets and assumed its liabilities, LCB was an extremely profitable and wealthy entity, which consistently enjoyed economic growth and success. This fact is reflected in a document entitled "Financial Figures" published by LCB in February 2011, which is attached to the FAC as **Exhibit 2** and incorporated therein.

However, after SGBL's purchase of LCB's assets and assumption of its liabilities, LCB represented to the United States Supreme Court that it had been rendered "defunct, insolvent, and unable to pay any judgment rendered against it."[15]

Thus, LCB is now unable to satisfy any judgment against it; yet, absent and but for SGBL's purchase of LCB's assets and assumption of its liabilities, LCB would easily have been able to satisfy a judgment against it in favor of the plaintiffs.

---

[15] LCB's **Brief in Opposition** in *Licci v. Lebanese Canadian Bank*, No. 16-778 (U.S.), (Feb. 17, 2017), at 4; available at 2017 WL 712025 and at https://www.scotusblog.com/wp-content/uploads/2017/02/16-778-BIO.pdf

## ARGUMENT

### A.    This Court Has Personal Jurisdiction Over the SGBL

SGBL argues that this action should be dismissed for lack of personal jurisdiction. For the reasons below, this argument is meritless and should be rejected.[16]

*First*, as discussed above, the New York Court of Appeals and the Second Circuit have already determined that LCB is subject to personal jurisdiction in New York for actions arising from its provisions of financial services to Hizbollah – i.e., for the very conduct complained of in this action. *See Licci*, 960 N.Y.S.2d 695; *Licci*, 732 F.3d 161.

*Second*, it is black-letter law that where, as here, a corporation is subject to personal jurisdiction, its successor is, too. "It is well settled that when a person is found to be a successor in interest to a person over whom the court has personal jurisdiction, the court gains personal jurisdiction over the successor simply as a consequence of their status as a successor in interest." *Gentry v. Kaltner*, 2020 WL 1467358, at *7 (S.D.N.Y. Mar. 25, 2020) (quoting *McDonald v. N.Y. Reg'l Rail Corp.*, 2015 WL 2091841, at *2 (E.D.N.Y. Apr. 30, 2015)).

Thus, a successor may be found subject to personal jurisdiction for the actions of its predecessor "without regard to whether [the successor] had any other minimum contacts with the state." *LiButti v. United States*, 178 F.3d 114, 123-24 (2d Cir. 1999) (collecting cases). *See also*

---

[16] The personal jurisdiction challenge must be resolved before reaching any of SGBL's other grounds for dismissal, including preclusion. See *Siegel v. Apergis*, 610 F. App'x 15, 16 (2d Cir. 2015) (summary order) ("Issue and claim preclusion go to the merits of a claim, which a court cannot adjudicate in the absence of jurisdiction."); *24 Franklin Ave. R.E. Corp. v. Heaship*, 2017 WL 1194702, at *7 (S.D.N.Y. Mar. 30, 2017) ("Defendants ... seek judgment in their favor on the grounds that Plaintiffs' claims are precluded by collateral estoppel … Before addressing the merits of the Parties' Motions, the Court must first tackle the jurisdictional challenges Defendants raise."); *Dutrow v. New York State Gaming Comm'n*, 2014 WL 11370355, at *3 (E.D.N.Y. July 29, 2014) (court required to determine jurisdictional challenge prior to addressing claim of collateral estoppel).

*e.g. Leon v. Shmukler*, 992 F. Supp. 2d 179, 190 (E.D.N.Y. 2014) ("It is well-settled 'that when a person is found to be a successor in interest' to a person over whom the court has personal jurisdiction, 'the court gains personal jurisdiction over [the successor] simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state.'") (quoting *LiButti*); *Fly Shoes v. Bettye Muller Designs*, 2015 WL 4092392, at *2 (S.D.N.Y. July 6, 2015) ("An allegation of successor liability against an entity whose predecessor is subject to personal jurisdiction can provide personal jurisdiction over the successor entity.") (quoting *Time Warner Cable. v. Networks Grp.*, 2010 WL 3563111, at *5 (S.D.N.Y. Sept. 9, 2010)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *35 (S.D.N.Y. Oct. 20, 2015) (when "a defendant is the successor in interest to an entity whose contacts would subject it to specific personal jurisdiction, then that defendant is also subject to personal jurisdiction.").

***Third***, it is crystal clear that SGBL assumed LCB's liability to the plaintiffs. There are two separate and independent tests for imposition of successor liability: (i) the "traditional common law test"; and (ii) the "substantial continuity" test. SGBL is LCB's successor under both tests.

### i.    The Traditional Common Law Test

Under traditional common law (and New York law) "a buyer of a corporation's assets will be liable as its successor if … it expressly or impliedly assumed the predecessor's tort liability." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (citation omitted) *Cf. In re Motors Liquidation Co.*, 792 F. App'x 28, 31 (2d Cir. 2019) ("[C]ontractual assumption can be a route to successor liability. As we have said, successor liability may attach to a buyer of a corporation's assets where the buyer 'expressly or impliedly assumed the predecessor's tort liability.'") (quoting *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d at 209).

There is no question that SGBL "expressly … assumed [LCB]'s tort liability." SGBL's contractual assumption of LCB's liabilities under the Purchase Agreement was universal and all inclusive, encompassing "*inter alia*": "any and all of [LCB]'s liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to [LCB]'s Business, all as at the Completion Date." FAC ¶ 12, ¶ 126; FAC **Exhibit 1**, Paragraph 2.3.

Thus, SGBL contractually assumed all of LCB's liabilities, including its liabilities to victims of Hizbollah terrorist attacks caused and facilitated by LCB, such as the plaintiffs herein.

### ii.     The Substantial Continuity Test

The "substantial continuity" test was developed by the federal courts in order to expand successor liability beyond the traditional common law test, "when a claim arising from a violation of federal rights is involved." *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 747 (7th Cir. 1994). While it has been applied most frequently in the employment law context, it is not restricted to such cases. *See e.g. Rowe Entm't, Inc. v. William Morris Agency*, 2005 WL 22833, at *79 (S.D.N.Y. Jan. 5, 2005) (applying the substantial continuity test in non-employment federal civil rights case); *U.S. v. Am. at Home Healthcare & Nursing Servs., Ltd.*, 2017 WL 2653070, at *16 (N.D. Ill. June 20, 2017) (applying substantial continuity test in False Claims Act case); *U.S. ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 195 (D.D.C. 2002) (same).

The ATA was enacted to vindicate vital national interests, which are at least as important as those protected by the federal labor statutes. "[T]he ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for ***protecting the public's interests*** through private enforcement … The District Court here appropriately recognized the

*important U.S. interests* at stake in arming private litigants with the weapons available in civil litigation *to deter and punish the support of terrorism*. *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013) (emphasis added) (citation and internal quotation marks omitted). Thus, "the interests of the United States weigh heavily" in ATA actions such as this (*id.*), and those national interests would be gravely harmed if U.S. terror victims are unable "to deter and punish the support of terrorism," due to devious corporate shell games which leave them with no remedy.

Accordingly, in the unlikely event that SGBL is not found to be LCB's successor under the traditional common law test, the Court should apply the "substantial continuity" test.

When applying the substantial continuity test, "courts look at three essential factors: (1) whether the successor had notice of the claim prior to the acquisition; (2) whether the successor substantially continued the business operations of its predecessor following the acquisition; and (3) whether the predecessor is able to provide the relief sought." *Huan Wang v. Air China Ltd.*, 2020 WL 1140458, at *6 (E.D.N.Y. Mar. 9, 2020) (quotation marks omitted).[17] "[N]o one factor is controlling, and it is not necessary that each factor be met to find successor liability." *Id.*

All these factors are easily met here. The *Licci* action (which included claims asserted by 18 of the plaintiffs in this case) was filed against LCB in 2008, and was still pending in early 2011, when SGBL assumed all of LCB's liabilities. (FAC ¶ 127). Obviously, then, SGBL had full notice that LCB's liabilities included claims by victims of Hizbollah terrorism. In respect to the third

---

[17] Courts in this circuit often expand this test into nine factors, by breaking the "degree of continuity factor" into seven sub-factors, namely: (a) whether there has been a substantial continuity of business operations; (b) whether the successor uses the same plant; (c) whether it uses the same or substantially the same work force; (c) whether it uses the same or substantially the same supervisory personnel; (d) whether the same jobs exist under substantially the same working conditions; (e) whether it uses the same machinery, equipment, and methods of production; and (f) whether it produces the same product. *See e.g. Hidalgo v. New Ichiro Sushi, Inc.*, 2017 WL 4712789, at *11 (S.D.N.Y. Sept. 27, 2017).

factor, before SGBL stripped it of its assets and assumed its liabilities, LCB was extremely profitable and wealthy, and consistently enjoyed economic growth and success. (*See* FAC ¶ 128; FAC **Exhibit 2**). But after SGBL's purchase of LCB's assets and assumption of its liabilities, LCB represented to the U.S. Supreme Court that it had been rendered "defunct, insolvent, and unable to pay any judgment rendered against it." (FAC ¶ 129, quoting LCB's Brief in Opposition in *Licci v. LCB*, No. 16-778 (U.S.), (Feb. 17, 2017), 2017 WL 712025).

The "continuity of business operations" factor is also easily shown. After acquiring all of LCB's assets, SGBL continued LCB's banking operations unchanged, from the same locations and using the same personnel – merely swapping in the SGBL name. In a press release issued on September 9, 2011, SGBL announced that: "As of today, all of the 35 branches that were acquired [from LCB] will become under SGBL's signage and will therefore display the brand's colors and corporate identity." (FAC ¶ 125; Sept. 9, 2011 press release (attached as Exhibit D)). And on March 3, 2011, the governor of Lebanon's Central Bank confirmed that SGBL had "pledged to keep all LCB employees." (FAC ¶ 125; Associated Press, *Lebanese Bank Accused of Laundering to Merge*, Mar. 4, 2011 (attached as Exhibit E)).

Thus, the "substantial continuity" test is clearly met here.

In sum: SGBL is subject to personal jurisdiction in this action, as the successor to LCB. SGBL seeks to challenge the conclusion, but its arguments are meritless:

***First***, SGBL claims half-heartedly that it is not bound by *Licci*, because, purportedly: "Since *Licci*, the Second Circuit has clarified that, where, as here, the in-forum contacts are limited, a plaintiff must show a *proximate causal relationship* between those contacts and the harm complained of. *See SPV Osus Ltd.*, 882 F.3d at 344" (Memo at 22). This argument fails. In the first place, even if there had been a subsequent change in law, the decisions in *Licci* remain res judicata

for both LCB and SGBL (which, as LCB's successor, is clearly its privy). Moreover, there has been no change whatsoever in the law. *SPV Osus* breaks no new ground, and simply applies the standard established in *Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998). In fact, *SPV Osus quotes with approval* the holding in *Chew* that personal jurisdiction may be established "even though the acts within the state are not the proximate cause of the plaintiff's injury." (882 F.3d at 344).

   **Second**, SGBL asserts that successor liability is *never* available under the ATA. (Memo at 29-37). SGBL claims that the ATA excludes successor liability because it does not mention it explicitly. But explicit mention in a statute has never been a prerequisite for successor liability. *See e.g. Nat'l Serv. Indus.*, 460 F.3d at 206 ("CERCLA does not specifically provide that a successor corporation may be held liable for response costs. Nevertheless, we have held that CERCLA encompasses successor liability.")

   SGBL cites no authority for its novel claim that statutory silence precludes successor liability, because none exists. Instead, it attempts to draw an analogy to the Second Circuit's holding that 18 U.S.C. § 2333(a)'s silence "on the subject of secondary liabilities means there is none," *Rothstein v. UBS AG*, 708 F.3d 82, 98 (2d Cir. 2013) (quoting *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008)).

   *Rothstein* and *Boim* held, relying on *Central. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 182 (1994) (also cited by SGBL), that Congress, having included several express provisions with respect to aiding and abetting in connection with the ATA's *criminal* provisions, must have intentionally omitted common law aiding and abetting from the ATA's *civil* provisions set forth in § 2333(a). According to SGBL, just as Congress's silence meant that it did not authorize *secondary* liability under the ATA (prior to the enactment of § 2333(d)), Congress's silence also means it has not authorized *successor* liability.

-23-

The analogy fails. The *Rothstein/Boim* rule does not limit *who* is liable under the ATA, but what *types of causes of action* are available. *See Central Bank of Denver*, 511 U.S. at 173 (explaining that aiding and abetting conduct may be wrongful, but does not match the conduct required for a 10b-5 claim). Successor liability does not create a new cause of action or punish the succession of interest itself – it simply transfers the consequence of the predecessor's conduct onto the successor (just as the assignment of a plaintiff's claim transfers the benefit, not her injury). Here, the conduct at issue is LCB's alleged violations of §2333(a) and (d).

An argument substantively identical to that asserted here by SGBL was rejected by courts in this circuit in respect to respondeat superior liability. In *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217 (S.D.N.Y. 2013), the defendant "urge[d] the Court to interpret *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A* as eliminating respondeat superior liability." *Id*. at 227. The court rejected that argument, drawing a sharp distinction between conduct-based liability and status-based liability:

> Central Bank abolished aiding and abetting liability for Section 10(b) violations on the theory that Section 10(b) did not prohibit aiding and abetting **conduct**. *In re Parmalat Sec. Litig.*, 474 F.Supp.2d 547, 551 (S.D.N.Y. 2007); *see Central Bank*, 511 U.S. at 178, 114 S.Ct. 1439 ("[T]his case concerns **the conduct prohibited** by § 10(b).") As U.S. District Judge Lewis A. Kaplan has observed, respondeat superior is not a theory of liability based on the **defendants conduct**; rather, **it is liability based on the defendant's status**. *In re Parmalat*, 474 F.Supp.2d at 550–51. The U.S. Supreme Court did not address that type of liability in Central Bank and therefore respondeat superior survived Central Bank of Denver as a legal principle in section 10(b) litigation.

*Id*. at 227 (emphasis added).

Exactly so here: SGBL's successor liability is based on its *status*, not its *conduct*. Therefore, the holdings in *Central Bank*, *Rothstein* and *Boim* are entirely inapposite.

Indeed, it is well established that respondeat superior liability is available in ATA actions,

notwithstanding *Central Bank*, *Rothstein* and the statutory silence regarding such liability. *See Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014) (collecting cases). Likewise, successor liability is available under the ATA.

For the same reason, SGBL's argument that the ATA's punitive nature should not apply to an otherwise innocent successor is misguided – it is LCB's conduct, liability for which SGBL knowingly assumed – that the ATA "punishes."[18] Furthermore, successor liability is also available under RICO which, like the ATA, provides for treble damages. *See e.g. R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 643 (S.D.N.Y. 1995); *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 457 (S.D.N.Y. 2015).

Just like SGBL here, the defendant in *R.C.M. Exec. Gallery Corp* "argue[d] that the theory of successor liability does not apply in this case because the defendant is a separate and distinct entity that had nothing to do with the [underlying conduct]." The federal court crisply dismissed this argument, stating that it "reveals a complete misunderstanding of the very principle of successor liability, which is fundamentally a form of secondary, vicarious liability imposed upon an innocent party." *R.C.M. Exec. Gallery Corp.*, 901 F. Supp. at 636.

If a court were to adopt SGBL's reading that for a successor-in-interest to assume liability the successor would have to itself commit the tort or exhibit the requisite mental state, it would render the concept meaningless for *any* common law or statutory tort.

Lacking any authority supporting its view, SGBL relies on a misleading quotation from an

---

[18] SGBL also argues that the ATA requires "terrorist intent." That is incorrect. *See Boim*, 549 F.3d at 693 (primary liability requires recklessness), *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (secondary liability requires "general awareness," not "specific intent."). In any event, it is LCB's mental state, not SGBL's in purchasing LCB, that is relevant to the ATA. *See e.g. E.E.O.C. v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988) (tort liability transferred where "expressly assumed").

inapposite Coal Act case: "Where Congress wanted to provide for successor liability in the Coal Act, it did so explicitly." (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)). The Coal Act sought to protect coal industry retirees' pensions when their former employers went out of business, by assigning liability for those payments to certain defined successors-in-interest. The Supreme Court held that because Congress explicitly created liability for one class of successors but not another, that distinction must be treated as intentional. 534 U.S. at 452-53. These successors in interest had *not* assumed their predecessor's liabilities *except* as set forth in the statute. Here, of course, SGBL *chose* to assume all of LCB's liabilities.

SGBL also argues that imposing successor liability under the ATA would "apply[] U.S. law to a foreign asset purchase transaction," violating the "presumption against extraterritoriality." SGBL concedes that the ATA has exterritorial application, but argues that "Congress has not, however, instructed U.S. law to apply beyond the (evil) conduct constituting 'acts of international terrorism' to reach matters of (business) conduct, such as a foreign asset purchase transaction or other corporate law matters between two foreign entities." SGBL's argument is nonsensical. Plaintiffs were not injured by the "foreign asset purchase transaction," nor do they contend that the Purchase Agreement itself violated the ATA. The presumption against extraterritoriality does *not* mean courts cannot enforce contracts assigning ATA liability between foreign actors.

Finally, SGBL argues that recognizing successor liability for ATA liability would not serve the purpose of the ATA. To the contrary, the ATA's purpose *demands* such liability. As shown above, the ATA was enacted "to deter and punish the support of terrorism" through civil enforcement, and that therefore "the interests of the United States weigh heavily" in ATA actions such as this. *Linde*, 706 F.3d at 112. Those critical interests would be undermined severely if ATA defendants such as LCB could freely divest themselves of their assets and liabilities – and

successors such as SGBL could freely receive such assets and liabilities – secure in the knowledge that terror victims such as the plaintiffs herein will be unable to impose successor liability. Indeed, that would render the ATA an effective dead letter.

**Third**, SGBL claims that personal jurisdiction cannot be based on successor liability under New York law. (Memo at 16-21). This argument fails. SGBL ignores the extensive Second Circuit and other federal case law, cited and quoted above, holding that a successor inherits the jurisdictional contacts of its predecessor. This is a federal question case under the ATA, and personal jurisdiction is governed by federal, not state, law (to the extent there is any conflict).[19]

Moreover, SGBL purports to base its argument entirely on two New York State inferior court decisions, *BRG Corporation v. Chevron U.S.A., Inc.*, 82 N.Y.S.3d 798 (App. Div. 4th Dep't 2018) and *Semenetz v. Sherling & Walden, Inc.*, 801 N.Y.S.2d 78 (App. Div. 3d Dep't 2005).

But a brand-new 2020 decision of the First Department, *Gronich & Co., Inc. v. Simon Prop. Grp., Inc.*,  makes crystal clear that New York law does indeed impute the jurisdictional contacts of the predecessor to the successor. "Respondents' argument that jurisdictional contacts are not imputed to a successor by merger is misplaced. ***It is where the 'successor' has merely acquired the assets of the predecessor company that the contacts are not imputed***." *Gronich & Co., Inc. v. Simon Prop. Grp., Inc.*, 180 A.D.3d 541, 542, 119 N.Y.S.3d 456 (N.Y. App. Div. 2020) (citing

---

[19] It is true that the *Licci* court found jurisdiction over LCB under New York law, without discussing federal law. But the finding that LCB is subject to personal jurisdiction under New York means that, a fortiori, it is subject to personal jurisdiction under federal law. *See e.g. Sonera Holding B.V. v. Cukurova Holding A.S.*, 895 F. Supp. 2d 513, 519 (S.D.N.Y. 2012) ("Because the requirements for personal jurisdiction under New York law are more restrictive than those under the federal constitution, satisfaction of the former necessarily entails satisfaction of the latter."); *Members of Beede Site Grp. v. Fed. Home Loan Mortg. Corp.*, 2010 WL 5070758, at *3 (D.N.H. Dec. 6, 2010) ("Although the Court's exercise of personal jurisdiction is broad in federal question cases, the Court's reach is limited by the restrictions imposed by the rules governing service of process.").

*U.S. Bank N.A. v Bank of Am. N.A.*, 916 F3d at 156-158 (2d Cir 2019) (emphasis added).

Here, of course, SGBL did much, much more than "merely" acquire LCB's assets: it expressly assumed all of LCB's liabilities. Thus, under New York law, too, LCB's jurisdictional contacts were inherited by SGBL.

Furthermore, the Second Circuit quoted *Semenetz* itself as holding that "in certain circumstances the successor corporation may inherit its predecessor's jurisdictional status." *U.S. Bank Nat'l Ass'n*, 916 F.3d at 157 (internal quotation marks omitted, quoting *Semenetz*). Those circumstances include where the successor "is subject to all the liabilities of the acquired companies," (*id.* at 155-56), as SGBL is here, by express agreement. *See Perry Drug Stores v. CSK Auto Corp.*, 93 F. App'x 677, 681 (6th Cir. 2003) ("A court may impute the jurisdiction of a corporate predecessor to its successor where the successor ***expressly assumed the liability*** of the predecessor corporation.") (emphasis added).

***Fourth***, SGBL asserts baldly that, even if successor liability were available under the ATA, it has not assumed liability in this case. Its "arguments" in this regard – made in the face of the explicit language of the Purchase Agreement – are virtually non-existent. It claims that in the *original* complaint in this action plaintiffs alleged that SGBL assumed "substantially all" of LCB's assets, rather than "all" of LCB's assets. (Memo at 6). But aside from the fact that the original complaint is a nullity,[20] SGBL does not even attempt to explain the material difference between "substantially all" and "all," much less expressly claim that LCB's liabilities to the plaintiffs were

---

[20] There is no basis for the Court to disregard the FAC in favor of the original complaint. *Di Simone v. CN Plumbing*, 2014 WL 1281728, at *3 (E.D.N.Y. Mar. 31, 2014) ("Courts deciding a Rule 12(b)(6) motion to dismiss have occasionally disregarded facts alleged in an amended pleading when they directly and blatantly contradict an essential factual element as pled in a previous complaint and when the court discerns an intent to manipulate the pleadings in order to avoid an argument for dismissal.").

excluded from Purchase Agreement. SGBL does claim that it scrubbed certain tainted accounts when it purchased LCB's assets (Memo at 5-6), but even if true, that would be irrelevant: a bank's liabilities for its *own* tortious conduct do not inhere in an account or a customer, but in the bank itself. SGBL's purported decision not to continue a banking relationship with certain of LCB's Hezbollah-controlled accounts or customers does not reduce SGBL's assumption of LCB's own liabilities for LCB's pre-sale conduct. SGBL also claims that the section of the Purchase Agreement relied upon by the plaintiffs "lacks any context whatsoever" (Memo at 38), but it does not provide the allegedly missing context.

SGBL tries to excuse its total failure to even attempt to controvert plaintiffs' factual showing regarding its assumption of LCB's liabilities, by hiding behind Rule 12(b)(6). "SGBL recognizes that it is not entitled to offer specific, affirmative evidence at this stage of the proceeding to show that it did not contractually assume LCB's ATA liability arising from the Hezbollah rocket attacks." (Memo at 5). But as SGBL knows full well, that is simply not true. The existence, vel non, of successor liability in this case, will determine whether the Court has personal jurisdiction over SGBL, not just whether the FAC states a claim. It is well established that a defendant is free to submit whatever evidence it wishes to defeat personal jurisdiction. *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits."); *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015) ("The Court need not accept as true jurisdictional allegations "controverted by the defendant's affidavits."). Thus, if SGBL had some basis to claim that LCB's liability to the plaintiffs was not included in its assumption of liabilities, it could, should and would have submitted an affidavit or other evidence supporting such a claim, in order to defeat personal

jurisdiction. **Its failure to do so speaks volumes**.

**B.      Alternatively, the Court Should Permit Jurisdictional Discovery**

In the alternative, *i.e.*, if this Court finds that it cannot determine personal jurisdiction on the current record, it should permit plaintiffs to conduct targeted jurisdictional discovery, in order to obtain any missing facts relating to SGBL's assumption of LCB's liabilities, and to the elements of the substantial continuity test. Jurisdictional discovery is particularly appropriate where, as here, the full facts and documents are within the exclusive knowledge and control of the defendant, yet the defendant coyly refrains from presenting them to the Court – or even from countering the facts and documents presented by plaintiffs.

Indeed, courts frequently permit jurisdictional discovery when a plaintiff has made a colorable claim of successor liability. *See e.g. Leon*, 992 F. Supp. 2d at 187-88 ("Plaintiffs' allegations that Mednikov is a successor in interest or that he is subject to long-arm jurisdiction are insufficiently developed to permit judgment as to whether personal jurisdiction is appropriate. However, notwithstanding the failure to allege sufficient facts to  make a *prima facie* showing of jurisdiction, the complaint raises … a good faith, colorable claim for jurisdiction that warrants limited discovery on this issue before the Court renders its decision."); *Gentry*, 2020 WL 1467358, at *8 ("The Court finds that limited jurisdictional discovery is warranted on the issue of whether Voiceless is a successor in interest to Avatar Technologies Philippines … Plaintiff may be permitted to conduct jurisdictional discovery if it has at the very least made a sufficient start towards establishing personal jurisdiction … Here, where Plaintiff has alleged that Voiceless is a successor in interest, and certain facts with respect to this status are in dispute, limited jurisdictional discovery is appropriate.") (quotation marks and citations omitted); *Int'l Private Satellite Partners v. Lucky Cat*, 975 F. Supp. 483, 487 (W.D.N.Y. 1997) (permitting jurisdictional

discovery where personal jurisdiction was founded on a successor liability claim since "given the threshold nature of this issue, allowing some limited discovery would be the wisest course.").

So too here: plaintiffs have already made a strong showing of personal jurisdiction over SGBL on the basis of successor liability; thus, "given the threshold nature of this issue, allowing some limited discovery would be the wisest course," if the Court nonetheless finds their showing insufficient at this stage to render a decision on personal jurisdiction.

## C.    The New Plaintiffs Are Not Estopped by the Decision in *Kaplan v. LCB*

SGBL asserts that all the plaintiffs in this action – *i.e.*, both the Kaplan Plaintiffs and the New Plaintiffs[21]– are estopped from pursuing their claims against SGBL by the decision in *Kaplan v. Lebanese Canadian Bank, SAL,* 405 F. Supp. 3d 525 (S.D.N.Y. 2019) (Memo at 22-29). SGBL is mistaken. Whatever the merits of its estoppel arguments regarding the Kaplan Plaintiffs,[22] there

---

[21] As discussed above, "New Plaintiffs" refers to the plaintiffs in this action who were not plaintiffs in the *Licci* action, *i.e.*: Ester Lelchook (individually and as personal representative of the estate of David Martin Lelchook); Michal Lelchook; Yael Lelchook; Alexander Lelchook (individually and as personal representative of the estate of Doris Lelchook); Malka Kumer; Chana Liba Kumer; and Miriam Almackies.

[22] Plaintiffs accept SGBL's admission, expressly made in support of its estoppel argument, that "SGBL is LCB's successor-in-interest by virtue of the SPA; the parties therefore by definition are in privity." *Id*. at 24. The Kaplan Plaintiffs therefore do not dispute that unless and until the *Kaplan v. LCB* decision is vacated on appeal, it precludes their ATA successor liability claim against SGBL, which is LCB's privy. Plaintiffs respectfully note, however, that any finding of preclusion by this Court on the basis of *Kaplan*, would have to be subsequently vacated, if the dismissal in *Kaplan* is vacated on appeal. *U.S. Postal Service v. Gregory*, 534 U.S. 1, 15 (2001) (a "judgment based upon the preclusive effects of a prior judgment should not stand" if the first judgment is vacated) (Ginsburg, J., concurring) (citation, quotation marks and brackets omitted). *Levi Strauss v. Abercrombie & Fitch Trading*, 719 F.3d 1367, 1372 (Fed. Cir. 2013). ("[A]n initial reliance on preclusion must be reversed once the underlying judgment is reversed.")

But plaintiffs *do* dispute SGBL's risible assertion of *judicial* estoppel. (Memo at 28-29). Contrary to SGBL's claim, the *Kaplan* plaintiffs never asserted that LCB alone is liable to them, and Judge Daniels surely did not "adopt" any such non-existent position. Nor have plaintiffs ever taken the "position that LCB has *no* liability for its conduct because SGBL assumed all of its liabilities in the asset purchase." (*Id*. at 28). LCB remains liable for its conduct, and plaintiffs are entitled to sue both LCB and/or SGBL for their

is no basis whatsoever to estop the New Plaintiffs from pursuing their claims against SGBL.

SGBL asserts that the New Plaintiffs are bound by the ruling in *Kaplan v LCB* because they are in "privity" with the *Kaplan* plaintiffs, since they "are represented by the same counsel as the *Kaplan* Plaintiffs, [and] share the same legal interest as the *Kaplan* Plaintiffs." (*Id*. at 24). However, SGBL's privity arguments run directly afoul of the controlling Supreme Court precedent on the application of privity in the estoppel context, *Taylor v. Sturgell*, 553 U.S. 880 (2008).

In *Taylor*, the Supreme Court unanimously rejected the "virtual representation" theory of privity, on which SGBL seeks to rely here. As the Second Circuit has explained, *Taylor* "refused to adopt this virtual representation exception to the rule against nonparty preclusion, stating that it would be 'at odds with the constrained approach to nonparty preclusion' adopted by the Court's prior decisions, and would circumvent the protections guaranteed by the Due Process Clause." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 509 (2d Cir. 2019).

*Taylor* instead limited the application of privity-based preclusion "in a federal-question case decided by a federal court" (*id*. at 904), to six strictly delineated categories: (1) the nonparty agreed to be bound by the results of the prior litigation; (2) the nonparty and the party had "substantive legal relationship," such as  "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"; (3) "in certain limited circumstances," only, where a nonparty was "adequately represented" by the party, such as in "properly conducted class actions," and suits by "trustees, guardians, and other fiduciaries"; (4) where the nonparty "'assume[d] control' over the litigation" in which the judgment was rendered; (5) the nonparty brings suit "as the designated representative of a person who was a party to the prior adjudication"; and (6) where

---

damages. SGBL's assumption of LCB's liability rendered it, too, subject to suit by plaintiffs; it did not and could not have relieved LCB of liability toward the plaintiffs.

"a special statutory scheme" applies, such as "bankruptcy and probate proceedings … and *quo warranto* actions." (*Taylor* at 893-895).

*Taylor* further held that it is the burden of the party asserting estoppel – here SGBL – to prove facts supporting the putative claim of privity. (*Id*. at 906-907).

SGBL has entirely failed to carry its burden to prove privity because it cannot: the New Plaintiffs did not agree to be bound by the decision in *Kaplan v. LCB*; they have no "substantive legal relationship" with the *Kaplan* Plaintiffs; *Kaplan* was neither a "class action" nor a suit by "trustees, guardians, and other fiduciaries"; the New Plaintiffs did not "assume control" over the *Kaplan* case; the New Plaintiffs did not bring this action as "designated representatives" of the *Kaplan* Plaintiffs; and there is no "special statutory scheme" applicable here.

Furthermore, the cases cited by SGBL in purported support of its privity argument pre-date *Taylor* and are factually inapposite. Thus, SGBL relies on *Alpert's Newspaper Delivery v. The New York Times*, 876 F.2d 266 (2d Cir. 1989), where a trade association was the "admitted mastermind and financier" of two suits filed by its members. The association was the "admitted sponsor and orchestrator" of the two suits, and it "supervis[ed] the strategy of the litigation, had actually filed the complaint, had furnished legal assistance and was paying the independents' counsel." (*Id*. at 269-270). The facts underlying the finding of privity in *Alpert's* could not be more dissimilar to those presented here. And, of course, *Alpert's* is a pre-*Taylor* case.

Notably, the passage in *Alpert's* quoted by SGBL in its motion, basing privity on shared attorneys, relied in turn on *Ruiz v. Comm'r of Dep't of Transp. of City of New York*, 858 F.2d 898 (2d Cir. 1988). (*See Alpert's* at 277 (citing *Ruiz*)). But in a 2018, post-*Taylor* decision, *Leaf v. Refn*, 742 F. App'x 917 (6th Cir. 2018), the Sixth Circuit rejected an identical attempt to rely on *Ruiz*, on the indisputable grounds that *Taylor* had rendered *Ruiz* bad law, finding that "*Taylor*

implicitly overruled *Ruiz*." (*Id*. at 925). *Leaf* also correctly noted that "the plaintiffs in *Taylor* shared an attorney, too—yet the Supreme Court gave no weight to that fact when it reversed the lower courts' finding of res judicata." (*Id*. at 925). Moreover, as the Southern District held in another federal question case, "*Ruiz ...* applied the preclusion law of New York State. By contrast, this case calls for application of federal preclusion law." *Phillips v. Kidder, Peabody & Co.*, 750 F. Supp. 603, 608, n.5 (S.D.N.Y. 1990) (citation omitted).

The facts of the other cases cited by SGBL are equally irrelevant here. *Senatore v. Ocwen Loan Servicing*, 2017 WL 3836056 (S.D.N.Y. Aug. 31, 2017) was not a privity case at all; rather "both parties in this action were themselves involved in the underlying litigation" (*id*. at *4), and the court mentioned "privity" only because it was mistakenly invoked by a *pro se* plaintiff. In *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263 (2d Cir. 2012), the court found privity because an organization representing African American firefighters was both a party to, and "the driving force" behind, both the first and second suits, and because it had been "vested with the authority of representation" by the plaintiffs. (*Id*. at 285). In *Frydman v. Akerman*, 280 F. Supp. 3d 418 (S.D.N.Y. 2017), the court based its finding of privity and estoppel from a prior arbitration on the fact that one plaintiff, who also "own[ed] the litigation claims" of the other two plaintiffs, both "control[ed] the respondents to the arbitration by virtue of being the CEO and Chairman [and] personally litigated much of the arbitration." (*Id*. at 425.). Simply put, the relevant facts in all of these cases are completely inapposite to the facts of this case.

In sum: SGBL has failed entirely to meet its burden to adduce and prove facts showing that the New Plaintiffs are in privity with the Kaplan Plaintiffs under the strict test set forth by the Supreme Court in *Taylor* for federal question cases, and so its estoppel argument must be rejected.

### D.     The FAC States a Claim for Liability Under the ATA

SGBL argues that the FAC does not state a claim for liability under the ATA.[23] SGBL is

mistaken, as shown below.

#### a.  The FAC States a Claim for Secondary Liability

##### 1.   *The FAC Sufficiently Alleges That LCB Aided, Abetted and Conspired With "the person who committed" the Rocket Attacks*

SGBL argues, as a "threshold" challenge to secondary liability, that the FAC fails to allege

that LCB aided, abetted or conspired with "the person who committed" the acts of international

terrorism from which plaintiffs' injuries arise, as required by ATA § 2333(d)(2). (Memo at 46).

Though not entirely clear, SGBL's argument here appears to be that Hezbollah is "the person who

committed" the acts of international terrorism, because it fired the rockets, whereas LCB's

"customers" did not include Hezbollah by name.[24] This argument fails for two reasons. *First*,

---

[23] SGBL bases its argument almost entirely on rulings contained in the decision in *Kaplan,* 405 F. Supp. 3d 525, which dismissed the Kaplan Plaintiffs' claims against LCB. While plaintiffs strongly disagree with *Kaplan*, there would appear to be no point in plying the Court with a critique of *Kaplan*, since is on appeal before the Second Circuit, which will either affirm it, or vacate it in whole or part.

SGBL also relies heavily on cherry-picked quotations from a number of cases arising from completely different factual circumstances, such as *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) and *O'Sullivan*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019). But those cases involved defendants which provided material support to foreign states and other independent third-parties, which in turn were alleged to have provided material support to terrorist groups.

Those indirect support cases are inapposite on the facts here: LCB did not provide services to Iran, or some other independent actor, which in turn funded Hizbollah. Rather, LCB provided material support directly to FTO Hizbollah through its wholly-controlled constituent Hizbollah entities and leaders.

[24] LCB coyly refrains from identifying Hezbollah as the "person" who fired the rockets, within the meaning of ATA § 2333(d)(2). If LCB plans to argue that "the person who committed" the act of international terrorism in § 2333(d)(2) includes only the individual terrorists who fired the rockets, such an argument is foreclosed by § 2333(d)(1), which incorporates by reference the definition of "person" contained in U.S.C. § 1. That provision (1 U.S.C. § 1) in turn broadly defines "person" to include

plaintiffs have plausibly alleged – echoing multiple statements of the U.S. government and other highly authoritative sources – that Shahid, Bayt al Mal and Yousser are integral *parts* of Hizbollah *itself*. Thus, the FTO known as Hizbollah includes, as part of the Hizbollah organization, the subordinate constituent entities known as Shahid, Bayt al Mal and Yousser; accordingly, by aiding, abetting and conspiring with Shahid, Bayt al Mal and Yousser, which are part of FTO Hizbollah, defendant LCB *per se* aided, abetted and conspired with Hizbollah.

*Second*, it is long and well established that entities which are affiliated with an FTO are considered legally inseparable parts of the FTO for purposes of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) and ATA, even though such entities were never designated by the United States. Thus, in *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152 (D.C. Cir. 2004), the D.C. Circuit found that "it is silly to suppose that Congress empowered the Secretary to designate a terrorist organization only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have

---

"corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Thus, the definition of "person" applicable here includes both natural persons *and* organizational entities and associations – whether incorporated or not. *See Jund v. Town of Hempstead*, 941 F.2d 1271, 1284 (2d Cir. 1991) (1 U.S.C. § 1 includes unincorporated associations).

Therefore, "the person who committed" the act of international terrorism within the meaning of § 2333(d)(2) plainly includes *both* the FTO itself (in this case, Hezbollah), *and* the individual terrorist operatives who were involved in the attack. "Congress intended a broader definition of 'person' beyond just the specific individual representative of the Foreign Terrorist Organization who, for instance, actually planted the EFP that injured or killed a plaintiff." *Miller v. Arab Bank, PLC*, 2019 WL 1115027, at *8-9 (E.D.N.Y. Mar. 11, 2019) ("the 'person' who committed such an act of international terrorism may include individuals but may also include associations, societies, and other entities … a defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual 'triggerman' or suicide bomber. That is precisely why Congress broadly defined 'person' under the ATA to include entities, as well as individuals.").

enjoyed had it never been designated" and that such a "crabbed view of alias status" "is at war not only with the antiterrorism objective of AEDPA, but common sense as well." *Id*. at 157-158.

Courts in this Circuit have consistently applied *Nat'l Council of Resistance* to hold that liability may be imposed under ATA §§ 2333(a) and 2339B where the defendant provided material support to an affiliate of an FTO. *See Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414, 434 (E.D.N.Y. 2013) ("The court … finds unconvincing [bank] Defendant's argument that its alleged support for Hamas was indirect because the money went through [various charities]. A jury could find that *Defendant sent the money to organizations that were controlled by Hamas, which is no different from sending the money directly to Hamas for purposes of the ATA*.") (emphasis added); *Goldberg v. UBS*, 660 F. Supp. 2d 410, 432-433 (E.D.N.Y. 2009) ("liability may be found under § 2339B even where support wasn't provided directly to an FTO. Such a circumstance may be found where an entity provides support to an alias or agent of an FTO" or "where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO."); *Gill v. Arab Bank*, 893 F. Supp. 2d 542, 555 (E.D.N.Y. 2012) ("liability may attach under § 2339B when a defendant provides material support to the alter ego or alias of a designated FTO."); *Strauss v. Credit Lyonnais*, 2006 WL 2862704, at *10 (E.D.N.Y. Oct. 5, 2006) (same).

The Second Circuit has endorsed these precedents, holding that "a defendant may be liable for civil remedies under § 2333(a) for providing material support to an organization that solicits funds for an FTO." *Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 209 (2d Cir. 2014).

As discussed *supra*, plaintiffs have plausibly alleged, based on unimpeachable sources, that Shahid, Bayt al Mal and Yousser are controlled by Hizbollah and serve as Hizbollah's central financial arms. These facts (which SGBL does not and cannot dispute) place this case on all fours with the precedents above. *Strauss*, 925 F. Supp. 2d at 434 (bank's transfer of funds to charities

"controlled by Hamas" was " no different from sending the money directly to Hamas for purposes of the ATA."); *Weiss*, 768 F.3d at 209 (bank which provided services to Welsh charity which "solicit[ed] funds or other things of value" for Hamas could be held liable for provision of material support to FTO Hamas); *Goldberg*, 660 F. Supp. at 432-433 (Plaintiffs "sufficiently pled that UBS knowingly provided financial support to a FTO, Hamas," because it provided services to two charities which raised funds for Hamas); *Strauss*, 2006 WL 2862704, at *11 (bank's provision of services to support to Hamas-affiliated charitable organizations which "collect and distribute their funds on behalf of HAMAS by paying expenses for and assisting with the provision of housing subsidies to the families of suicide bombers recruited by HAMAS" constituted provision of material support to FTO Hamas).[25]

Thus, SGBL's "threshold" challenge to secondary liability fails.

### 2. *The FAC States a Claim for Aiding and Abetting*

Section 2333(d) of the ATA provides that for "an injury arising from an act of international terrorism committed, planned, or authorized" by an FTO, liability will be imposed on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d). As discussed

---

[25] LCB's provision of services to Hizbollah leaders al-Shami and Sbeity, whose names were also on some of Bayt al-Mal's accounts also constituted provision of material support to, and aiding, abetting and conspiring with, FTO Hizbollah. *See Miller*, 2019 WL 1115027, at *1, *5 (allegation that bank provided services to Hamas and Hamas leaders stated claim under the ATA); *Linde v. Arab Bank*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018) (bank liable under the ATA for transferring funds to accounts held by Hamas leaders); *U.S. v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016) (provision of material support to an individual is material support to an FTO if the individual "is engaged in significant activity on behalf of an FTO relative to that FTO's goals and objectives"), *aff'd* 896 F.3d 295 (4th Cir. 2018).

*supra*, the "person" who committed such an act of international terrorism may include both the FTO and its affiliates, and natural persons.

In enacting ATA § 2333(d), Congress "instructed that the 'proper legal framework for how aiding and abetting liability should function' under the ATA is that identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5)) (brackets omitted).

Aiding and abetting liability under ATA § 2333(d) requires that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*) (internal quotation marks omitted).

A plaintiff does not have to prove the defendant "knew of the specific attacks at issue when it provided financial services for" organizations like Hizbollah to prove the defendant's general awareness, nor is it necessary to prove "defendant's intent to participate in a criminal scheme as something that he wishes to bring about and seek by his action to make it succeed." Rather, to be liable a defendant need only be "generally aware that it was thereby playing a role in [the FTO's] violent or life-endangering activities." *Id*. (internal quotation marks omitted).

Following *Halberstam*, the Second Circuit identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the third element, namely: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id*.

SGBL argues that the FAC's aiding and abetting claims fails to plead sufficiently that LCB was aware of its role in Hizbollah's activities, or that LCB knowingly and substantially assisted the principal violation. (Memo at 48). As a threshold matter, SGBL's argument is precluded by the Second Circuit's rulings, discussed above, which found that the First Amended Complaint in *Licci* sufficiently pleaded that LCB *purposely* and *intentionally* assisted Hizbollah to carry out terrorist attacks against civilians in Israel as a matter of policy, and that the assistance provided by LCB "substantially" assisted and enabled Hizbollah to carry out the attacks here. *See Licci*, 732 F.3d at 169-173; *Licci*, 834 F.3d at 215-219. Indeed, unlike ATA aiding and abetting, ATS aiding and abetting requires "purpose rather than knowledge alone." *Licci*, 834 F.3d at 217 (citation omitted). Thus, the Second Circuit's holding in *Licci* regarding ATS aiding and abetting applies to plaintiffs' ATA claims *a fortiori*.[26]

Moreover, even assuming *arguendo* that it was not precluded, SGBL's argument here is soundly refuted by a perusal of the actual allegations of the FAC:

- LCB knew that Hizbollah is a violent, dangerous and deadly terrorist organization.

- Shahid, Bayt al Mal and Yousser are integral constituent parts of Hizbollah, and al-Shami and Sbeity are Hizbollah leaders.

- LCB knew that Shahid, Bayt al Mal and Yousser are integral constituent parts of Hizbollah, and that al-Shami and Sbeity are Hizbollah leaders.

- Shahid's full name means "Martyr Foundation" in Arabic, and its role within Hizbollah is to ***provide funding and other material support to injured terrorists and the families of terrorists*** who were killed, in order to "provide peace of mind to current and prospective" terrorists, and LCB was well aware of these facts.[27]

---

[26] Indeed, the First Amended Complaint in *Licci*, a copy of which is attached hereto as Exhibit F, is far *less* robust and detailed than the FAC in this action.

[27] LCB's relationship with Shahid is especially salient. As discussed in the FAC, Shahid's role in Hizbollah is to fund a "terrorist insurance scheme," which makes it identical in all relevant aspects to the "terrorist insurance scheme" which gave rise to liability in the ATA litigation in the EDNY against the Arab Bank. *See e.g. Miller*, 2019 WL 1115027 at *2, 7-9 (holding that bank's administration of "terrorist

- Hizbollah needed banking services to plan, prepare for and carry out terrorist attacks, and provision of such services to Hizbollah enabled and caused such terrorist attacks.

- LCB knew that Hizbollah needed banking services to plan, prepare for and carry out terrorist attacks, and that providing Hizbollah such services would enable and cause such terrorist attacks.

- LCB provided extensive banking services to Hizbollah for *many years*, including transfers and deposits totaling *many millions of dollars*, through accounts nominally titled to Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity.

- LCB also assisted Hizbollah to *evade reporting requirements* on its banking activities.[28]

- LCB was involved in transferring funds, and concealing and disguising the true facts regarding those funds, as part of a scheme to benefit Hizbollah.

- LCB dismissed a 2002 UN report about its relationship with Hizbollah as "propaganda" from "the Jewish state," and in response *increased* Hizbollah's credit limits.

- Even *after* Yousser was designated by the U.S Treasury as a Specially Designated Global Terrorist, because of its role as "Hizballah's unofficial treasury," LCB continued to maintain a banking relationship with Yousser.

- Between 2007 and 2011 LCB knowingly assisted Hizbollah to launder hundreds of millions of dollars through a complex international scheme.[29]

- LCB ultimately "martyred" itself on behalf of Hizbollah – it was forced to cease operations and shut down, due to its activities on behalf of Hizbollah. This clearly demonstrates LCB's dedication to Hizbollah and its terroristic goals.

All of these allegations are highly detailed, specific and fully plausible; indeed, many of

them rest on statements by the U.S. government, including the information contained in the VAC,

---

insurance scheme" gives rise to primary and secondary ATA liability); *Linde v. Arab Bank*, 706 F.3d 92, 97 (2d Cir. 2013) (discussing "death and dismemberment benefit plan" serving same role as Shahid).

[28] Notably, "[t]he provision of banking services, 'in an unusual way under unusual circumstances for a long period of time' supports the inference that the defendant provided knowing assistance." *Miller*, 2019 WL 1115027, at *9 (quoting *Halberstam*, 705 F.2d at 487).

[29] LCB's post-2006 conduct is of course relevant to proving its state of mind prior to 2006. *See e.g. U.S. v. Germosen,* 139 F.3d 120, 127 (2d Cir. 1998) (finding "'Subsequent act' evidence may be admitted under Rule 404(b)" to show intent of conduct during charged conspiracy.); *U.S. v. Rutkoske,* 506 F.3d 170, 174, 178 (2d Cir. 2007); *Ismail v. Cohen,* 899 F.2d 183, 185, 188-89 (2d Cir. 1990).

and testimony and statements made by respected terrorism experts. These allegations easily state a claim that LCB "knowingly and substantially assisted" Hizbollah and "was 'generally aware' that it was thereby playing a 'role' in [Hezbollah's] violent or life-endangering activities."

Additionally, Shahid's specific role of supporting Hizbollah **terrorists** – as opposed to some other element of Hizbollah's activities – is particularly relevant here. Because Shahid is a constituent part of Hizbollah involved particularly in assisting terrorists, this is not a case where the defendant can claim to have been supporting an FTO *generally*, but not its terror activities. Shahid's role was not a secret: on the contrary, the fact that Shahid's raison d'être was to assist Hizbollah terrorists was widely and repeatedly publicized for many years prior to 2006, including even in public service announcements on Hizbollah's TV station in Lebanon! FAC at ¶ 98.[30] Therefore, similar to Arab Bank, LCB knew full well that it was "playing a 'role' in [Hezbollah's] violent or life-endangering activities," inter alia by providing banking services in support of a program providing financial support for killed and injured terrorists. "Arab Bank … contends that, since the terrorist organizations it provided financial services to were also engaged in humanitarian activities, Arab Bank was not generally aware it was playing a role in their terrorist activities. However, these 'humanitarian' activities involved providing payments to the families of terrorists through the Insurance Scheme that Arab Bank administered." *Miller*, 2019 WL 1115027 at *9.

Therefore, SGBL's Rule 12(b)(6) challenge to plaintiffs' aiding and abetting claims is both precluded by the Second Circuit's previous holdings, and without merit.

---

[30] Thus, SGBL cannot rely on the decisions such as *Weiss v. National Westminster Bank*, 2019 WL 1441118, at *11 (E.D.N.Y. Mar. 31, 2019), *O'Sullivan, v. Deutsche Bank*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019), or *Siegel v. HSBC Bank*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018) where the plaintiffs failed to allege that the defendant banks had assisted the terrorism-related activities of the FTOs involved.

### 3.  *The FAC States a Claim for Conspiracy*

As its Second Claim for Relief, the FAC explicitly asserts a claim for conspiracy liability under the ATA, stating that LCB "engaged in an extensive, long-term ***criminal scheme*** with Hizbollah, pursuant to which LCB provided Hizbollah with wire transfer and other banking services to support Hizbollah's terrorist activities. Pursuant to and in furtherance of that ***common plan***, Hizbollah fired the rockets that harmed the plaintiffs." (FAC at ¶ 151) (emphasis added).

SGBL first argues that the phrases "criminal scheme" and "common plan" are insufficient, and in order to properly assert a claim for conspiracy plaintiffs were required to use the terms "agreed," "agreement," or "conspired." (Memo at 47). This argument is plainly meritless. "Federal pleading does not require the incantation of magic words." *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F. Supp. 1019, 1033 (W.D. Mich. 1989). Rather, the real question is whether the factual allegations of the FAC sufficiently plead conspiracy.

SGBL's second and final challenge to plaintiffs' ATA conspiracy claim is that the FAC "provides no facts to support a reasonable inference that LCB and the Five Customers made any agreement to engage in 'international terrorism' or on any subject other than what may be inferred from a typical arms-length customer relationship." (Memo at 48). This argument fails, in the first place, because it is precluded by the findings contained in the Second Circuit's decisions in *Licci*. As discussed above in the section on aiding and abetting liability, the Second Circuit expressly found that the *Licci* plaintiffs, traveling on a far less detailed complaint the FAC here, made a plausible, nonconclusory showing that LCB shared Hizbollah's terroristic goals as a matter of policy, and provided it with extensive banking services over a period of many years in order to help Hizbollah achieve those goals. That is precisely an "agreement to engage in 'international terrorism'."

Likewise, preclusion aside, the allegations of the FAC, detailed above in the section on aiding and abetting liability, clearly show the same thing: *i.e.*, that LCB and Hizbollah consciously and cooperatively worked in tandem for years in order to advance Hizbollah's terrorist goals. And since the rocket attacks which harmed the plaintiffs were carried out by Hizbollah in furtherance of that common plan, LCB is liable for conspiracy under the ATA.

SGBL's Rule 12(b)(6) motion to dismiss plaintiffs' conspiracy claim is thus both precluded by the Second Circuit's previous holdings, and lacking any merit.

**b. The FAC States a Claim for Primary Liability**

SGBL challenges plaintiffs' primary liability claims on a number of meritless bases. SGBL first asserts that plaintiffs have failed to sufficiently allege the ATA's "apparent intent" and "dangerousness" elements. But the ATA's "apparent intent" requirement is measured objectively. *Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 207, n. 6 (2d Cir. 2014). Here, as discussed *supra*, the Second Circuit found, and the FAC sufficiently alleges, that LCB had *actual*, subjective intent to support Hizbollah's terrorism against Israel and civilians in Israel. SGBL claims that there is an alternative explanation for LCB's conduct – a profit motive. But that explanation (aside from not rendering the ideological explanation *implausible*) is itself implausible, since LCB's conduct vis-à-vis Hizbollah resulted in its ceasing banking operations, as was easily predictable. Thus, yhe ATA's "apparent intent" requirement is therefore clearly satisfied.

As for "dangerousness," in *Linde* the Second Circuit found that "providing routine financial services to members and associates of terrorist organizations" is not inevitably, as a matter of law, dangerous to human life. *Linde*, 882 F.3d 314, 327. On the other hand, *Linde* did not hold that such conduct is *not* be dangerous to human life. Moreover, as discussed *supra*, LCB's provision of services to Hizbollah was anything but "routine." LCB moved tens of millions of dollars for

Hizbollah over a period of many years, and significantly enhanced Hizbollah's ability to carry out terrorist attacks – LCB thereby endangered human life.

Furthermore, LCB provided services to Shahid, which as discussed above was directly and specifically involved in funding Hizbollah's *terrorist* activities. The "dangerousness" element of the ATA is therefore satisfied here. *See Miller*, 2019 WL 1115027, at *7 (finding that the Arab Bank's provision of services to a program to financially support injured or killed terrorists, analogous to Shahid's assistance program, satisfied the ATA's "dangerousness" requirement).

SGBL also argues that plaintiffs have failed to sufficiently allege causation, attempting to analogize this case to *Rothstein*, *O'Sullivan* and other cases involving defendants which provided material support to foreign states and other independent third-parties, which in turn were alleged to have provided material support to terrorist groups.[31] But those indirect support cases are simply inapposite on the facts here: LCB did not provide services to Iran, or some other independent actor, which in turn funded Hizbollah. Rather, LCB provided material support directly to FTO Hizbollah through its wholly-controlled constituent Hizbollah entities and Hizbollah leaders.

Plaintiffs were required only to make plausible allegations that LCB's "conduct was a proximate cause of [their] harm, *i.e.* the conduct was a 'substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.'" *Miller*, 2019 WL 1115027, at *7 (quoting *Rothstein*, 708 F.3d at 92). Plaintiffs' detailed allegations that LCB moved tens of millions of dollars for Hizbollah which significantly enhanced its ability to carry out the rocket attacks, and that LCB not only foresaw but intended

---

[31] The decision in *O'Sullivan*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) is also an indirect support case, and so factually irrelevant to this action.

this result, easily meet this standard. *Cf. Miller*, 2019 WL 1115027, at *8 (finding proximate causation on the basis of similar facts).

Finally, SGBL claims in footnote 17 that plaintiffs have failed to allege that LCB's actions were criminal, or would be criminal if carried out in the United States. This argument, too, is meritless. Knowingly providing material support to FTO Hizbollah is a crime *inter alia* under 18 U.S.C. § 2339B, and LCB's conduct also violated 18 U.S.C. §§ 2339A and 2339C.

## CONCLUSION

For the reasons stated herein, SGBL's motion to dismiss should be denied in its entirety, and this matter should proceed to discovery and trial.


Dated:    Brooklyn, New York
          May 22, 2020

                                        Respectfully submitted,

                                        THE BERKMAN LAW OFFICE, LLC
                                        *Attorneys for the Plaintiffs*


                                        by: _____
                                             Robert J. Tolchin

                                        111 Livingston Street, Suite 1928
                                        Brooklyn, New York 11201
                                        718-855-3627